764 So.2d 1027 (2000)
STATE of Louisiana
v.
Janie HILTON.
No. 99 KA 1239.
Court of Appeal of Louisiana, First Circuit.
March 31, 2000.
*1029 Michael J. Reynolds, Asst. District Attorney, Franklinton, Dorothy Pendergast, Metairie, Counsel for State of Louisiana.
Frederick Kroenke, Baton Rouge, Counsel for Janie Hilton.
Before: CARTER, PETTIGREW and CLAIBORNE[1], JJ.
CLAIBORNE, Judge, Pro Tempore.
Defendant, Janie Hilton, was charged by bill of information with two counts of molestation of a juvenile, (Counts 1 and 2), violations of La. R.S. 14:81.2 and two counts of cruelty to juveniles, (Counts 3 and 4), violations of La. R.S. 14:93.[2] The alleged victims were defendant's biological daughter and son. She pled not guilty to all counts. After a trial, the jury returned the verdicts as follows: Count 1-guilty of indecent behavior with a juvenile, a violation of La. R.S. 14:81, Count 2-guilty of attempted molestation of a juvenile, a violation of La. R.S. 14:81.2 and 27, and Counts 3 and 4-guilty as charged. The trial court sentenced defendant on Count 1 to seven years at hard labor, to run concurrent with the sentence on Count 2; on Count 2 to seven and one-half years at hard labor without parole, probation or suspension of sentence, and on each of Counts 3 and 4 to ten years at hard labor, to run concurrent with each other and consecutive to the sentences in Counts 1 and 2. Defendant filed a motion to reconsider the sentences, which was denied. She appealed.

FACTS
Detective David Pittman of the Washington Parish Sheriff's Office testified that he became involved in the investigation of Janie and Richard Hilton in July of 1996. He was in juvenile court and present during a hearing on the termination of their parental rights. The Hilton's two younger children had been taken into state custody and the parents' rights were being terminated, allowing the children to be free for *1030 long-term foster care or adoption. Detective Pittman learned about the allegations of sexual abuse which had been made concerning the children, DH (girl) and DH (boy), ages 5 and 6, respectively. At the conclusion of the hearing, the judge terminated the parental rights.
Detective Pittman later spoke with Dr. Curtis, the doctor who examined the children after the complaint of the sexual abuse. Although Pittman had tried to locate Dr. Curtis before the trial, he could not do so. He also contacted the St. Tammany General Hospital and the Louisiana Medical Board in New Orleans to locate her present address, but had negative results. During the trial, the court made a determination that Dr. Curtis was unavailable as a witness and that the state had been unable to procure her attendance by process or reasonable means, pursuant to La.Code Evid. art. 804.
Detective Pittman further testified that the medical reports (State Exhibits 1 and 2) were written by Dr. Curtis and that the information in them is consistent with his conversations with the doctor. The detective explained that Dr. Curtis conducted an initial interview with both children prior to their physical examinations. During this interview, the boy stated that his father had played with his (the boy's) "talleywacker", that his father touched him several times and made the boy touch the father's "talleywacker." The physical examination of the boy did not reveal any physical findings of sexual abuse. Pittman further explained that because of the anatomy and physiology of the male child, "very, very seldom [are] any physical findings [of damage] found" in cases of sexual abuse involving the fondling or molestation of a boy.
The detective further testified that the young girl indicated that over a considerable period of time, her father got into bed with her, took her clothes off, including panties, and climbed on top of her, sometimes with his clothes off. He rubbed and pressed very hard against her vagina. During the physical examination, the doctor found evidence of blunt trauma injury to the hymen by the placement and pressing of some object against the outer vaginal walls and into the vaginal area. The doctor also noted a 4-millimeter tear in the girl's hymen at the 6:00 o'clock position, which is indicative of blunt trauma injury to the hymen and an attempted penetration by a penis, rather than digital penetration. Pittman explained that digital penetration is penetration of the vagina or anus with a finger.
Detective Pittman stated that videotaped interviews, which are conducted with a forensic interviewer and aid in the investigation and prevention of child sexual abuse, were made at the Children's Advocacy Center. The child is allowed to lead the interview and the interviewers are trained not to ask leading questions or to influence the child. In this case the interviewer was Cheri Staten. Detective Pittman viewed the tapes of the victims' interviews and found that they were consistent with testimony he heard during the termination hearing and with Dr. Joan Curtis' statements. These tapes contained information that Detective Pittman was trained to look for when there are allegations of sexual abuse at the hands of an adult perpetrator. The boy specifically stated in the tape that he was forced to lie naked on his mother and put his penis in her vagina, fondle her breasts and kiss her. The girl said that she was forced into bed with her father, that he would take her clothes off, lay on top of her and press very hard on her vagina. The girl also indicated that she was in the room and was forced to watch incidents involving simulation of sexual intercourse between her brother and mother. In some instances her parents would actually put the boy's penis in his mother's vagina. The girl also stated that she was forced to watch her parents engage in sexual intercourse and that her mother watched while the father molested the girl.
*1031 Detective Pittman stated that he interviewed the children and they said that their father drank all the time. In one incident, the father got in bed with the young girl, passed out and urinated all over her. When she went to her mother and told her about the incident, the mother refused to change the sheets and told the child to go back to bed.
Eventually, Pittman spoke with an assistant district attorney, obtained files on the children and arrested the parents. The children were placed in the home with a first cousin, who is attempting to adopt them.
On cross-examination, Detective Pittman acknowledged that both children also named "Keith, Vicky and Hope" as perpetrators of sexual abuse. The detective admitted that there was no formal case opened on these individuals and that he had not attempted to find any of the individuals, although he had information that "Hope" was in Mississippi. He further explained that he believed that "Hope" was a juvenile and an older daughter of defendant. He further admitted that the young girl stated that someone named "Keith", who was 18 years old, "did it with her." He could not deny that someone other than the father could have been responsible for the penile penetration and admitted that the girl's blunt trauma to her vagina could also have been caused by "Keith."
Margaret Ryals testified that she was employed by the Washington Parish Office of Community Services (OCS). She investigates reports of abuse and neglect. After she investigated the complaint in this case and made a valid finding, she filed an affidavit for the children to be placed in custody of the state. Ms. Ryals indicated that when they first met her, the young girl victim, asked "Are you the one that's going to make this stop?" Ms. Ryals asked the girl to explain what she was talking about and the child specifically stated that her father came into her room at night, climbed in her bed, took off her clothes, unzipped his pants, climbed on top of her and pressed hard. She also indicated that her father touched her between her legs, hurt her and put his tongue inside her mouth. The victim further stated that he drank every night and sometimes urinated in her bed. On cross-examination, Ms. Ryals stated that the young girl did not mention others, such as Hope, Keith, or Vicky, who may have sexually abused her.
Dr. Clifford Crafton was qualified as an expert in child sexual abuse and child psychiatry. He stated that the victims were patients of his and that he first saw the boy after his discharge from Greenbriar Hospital in February of 1994. The boy's sister was later referred to him and the doctor's role is predominately to make sure that the children's medication was being used correctly. When the girl was first treated, she had a great deal of energy and had difficulty in concentrating in school. She was impulsive, diagnosed with ADHD and placed on medication. She had an interest in sexual kinds of things and became more preoccupied with that kind of behavior and more irritable. Eventually hospitalized, she was found to have a "strong preoccupation with sexual manners [sic]", which is indicative of someone with sexual trauma. The child also had symptoms of posttraumatic stress disorder. The girl was referred to Valerie Turgeon, a psychologist with experience in treating victims of child sexual and physical abuse.
Dr. Crafton explained that his referral diagnosis of the boy was ADHD and conduct disorder, meaning that the boy was aggressive and argumentative. The boy also started having sexual behavior and became extremely interested in looking at female genitalia or underneath the blouse or dress of his foster mother. He also exposed his penis to other members of the foster family. Dr. Crafton explained that a significant part of both children's problems was related to the trauma of past physical and sexual abuse.
*1032 When Dr. Crafton talked with the children about testifying in court against their parents, they became upset. The young boy began having diarrhea and both children did not sleep well before their sessions with the doctor. The doctor wrote a letter stating that the children should not have to testify; rather, he believed that the videotapes should be utilized. He explained that the abuse still causes stress to the children and they become upset when asked questions about the abuse. Although not explicitly stating directly to the doctor, both children implied that they had been sexually abused by their parents. Dr. Crafton further testified that he would not disagree with the things stated in Dr. Curtis' medical report.
Dr. Valerie Turgeon, who was accepted as an expert in child developmental psychology and child sexual abuse, testified that she was the psychologist who treated the children. It was her professional opinion that they were victims of sexual abuse. She based this opinion upon their disclosures to her and other persons and upon the information given to her regarding Dr. Curtis' medical examination of the girl. Dr. Turgeon initially saw the children for an evaluation on October 17, 1993. She began therapy sessions with them on a weekly basis in February of 1994, and in July of 1994 she referred the girl to a treatment group. The children were seen by the doctor on a bi-weekly basis until June 1995.
Dr. Turgeon admitted her report indicated the girl told her that her father hit her brother and her mother and that her mother slept with her so her father would not "do it anymore." She testified that when she interviewed defendant, the defendant stated that if she could help it, she would stop the father from whipping the boy and that she had taken beatings herself or would hide belts to protect the children. Dr. Turgeon stated that defendant described both of her parents as heavy drinkers and her childhood as "hell." Defendant further related that her own mother had committed suicide; while at a Christmas party defendant's mother said to her, "I love you and wish you a Merry Christmas," and then went into another room and shot herself.
Based upon her interpretation of the Minnesota Multi-phasic Personality Test (personality test) that she administered to the defendant, Dr. Turgeon believed that defendant had a severe character disorder. She recommended that the mother be referred to a program to help her develop job-related skills and to individual therapy in order to deal with her disorder. She also recommended that the father be referred to a group for perpetrators in denial. The doctor further admitted that during her sessions with the children, she heard the name "Hope" mentioned as another alleged perpetrator. She did not hear the name "Keith" or "Vicky".
Dr. Turgeon interviewed defendant again on July 23, 1995, after defendant had legally married the father of the victims. When Dr. Turgeon questioned defendant about the marriage, defendant said because "love conquers a lot of things," she decided to marry him. Defendant said she had never seen the father beat the children and that she did not believe that he had ever molested their daughter. However, Dr. Turgeon testified that in the first interview defendant stated that she believed that the sexual abuse had occurred and that she had seen the father beat both children, although he beat the son on a more regular basis than the daughter. According to defendant, she did not complete therapy and did not complete the sexual abuse prevention class, but had completed the parenting class, and a drug and substance abuse program. In Dr. Turgeon's interview with the father, he was extremely vague in recalling incidents with the children that had been reported to OCS. He denied ever abusing the children and did not consider himself a problem drinker. On his personality test, he was not very truthful, a trait usually found *1033 in persons who are in denial about behavioral or personality disorders.
Dr. Turgeon also testified that while both children named the father as the sexual abuse perpetrator, the son included his mother in what would be termed sexual stimulation, the act of forcing the children to stay in the room while the parents were engaged in sexual activity. She further admitted that chronic alcoholism is a disease, that denial is an element of that condition, and that she did not refer defendant to any type of counseling for perpetrators.
Cheri Staten, the director of the Jefferson Parish Children's Advocacy Center, was qualified as an expert in forensic interviewing in the area of child sexual abuse. She testified that she does forensic interviews for Washington Parish and explained that a forensic interview is an interview with children used to gather information, not to conduct therapy. The children are given an opportunity to talk and are asked general questions, without discussing the allegations of the abuse. She also indicated that she wears an earpiece so that law enforcement officers can speak to her while they monitor the interview. She admitted that no attorney was present during the interview with the victims in this case. In conjunction with her testimony, the videotapes of the victims were played for the jury.
The defendant's sole witness was Diana Hilton, the defendant's older stepdaughter. Ms. Hilton testified that she was never sexually or otherwise abused by her father and admitted that her father would have had the opportunity to do that type of thing if he wanted. She further stated that "Hope" was defendant's daughter who lived in Philadelphia, Mississippi. When questioned about "Vicky", Ms. Hilton stated that she was the daughter of defendant's first cousin Peggy and lived in Bogalusa. Ms. Hilton also testified that "Keith" is another relative, who lives in Crossroads, Mississippi, about five minutes outside of Bogalusa. She added that she was never contacted by OCS, Detective Pittman, or any employee of the Washington Parish Sheriff's office or anyone from the District Attorney's office.

HEARSAY
In assignment of error number one, defendant alleges that the trial court committed error when it permitted the hearsay testimony of Ms. Margaret Ryals, an OCS investigator. Specifically, defendant contends Ms. Ryals' testimony about her conversation with the victims was not the initial report of the abuse and, thus, was not admissible as an initial complaint of sexually assaultive behavior under the La. Code Evid. art. 801(D)(1)(d). The state argues that the testimony is not hearsay because it was not offered to establish the truth of the matter asserted, but offered to show the basis of why the investigator urgently wanted the state to obtain custody of the children. The state further argues that the testimony is not hearsay and was admissible as the first complaint of sexual abuse under La.Code Evid. art. 801(D)(1)(d). Moreover, it contends that if the evidence was improperly introduced, it is merely corroborative and cumulative of the other testimony and, thus, harmless error.
At trial, Ms. Ryals testified as to her meeting with the children when they related the information about their sexual abuse. Defense counsel objected during this testimony, arguing that the report of the abuse was hearsay evidence and not the initial complaint of the abuse. During argument on the objection, defense counsel stated that the information he received from the state indicated that the first report of the abuse was to Shay Hilton, a cousin of the victims, and not an employee of OCS. The judge asked Ms. Ryals about the length of time between when the report was made to Shay Hilton and OCS received the complaint about the abuse. Ms. Ryals stated that she understood that OCS received the complaint the day after the allegations were made to Shay Hilton. The trial court then denied the objection *1034 and stated that it was allowing the testimony as an initial complaint of sexually assaultive behavior and further stated that the complaint was admissible under the excited utterance exception to the hearsay rule. The judge stated:
THE COURT:
I can state that for you. It's Article 801(D)(1)(d). I'm allowing her testimony pursuant to an initial complaint of sexually assaultive behavior. Even though we may hear later that first report was made by D_____ to her cousin Shay, I think under the same case you're making you're objection on, State v. Tucker, and State v. Herrin, both First Circuit cases, that this is close enough in time to even be considered an additional excited utterance. She said walked [sic] in the room and said, Are you the one that's going to make this stop? So pursuant to those reasons, your objection is overruled and she may testify to what D_____ said.
La.Code Evid. art. 801(C) defines hearsay as "a statement, other than one made by the declarant while testifying at the present trial or hearing, offered in evidence to prove the truth of the matter asserted." Hearsay is inadmissible unless it falls within an exception. La.Code Evid. art. 802. A statement is not hearsay if the declarant testifies at trial subject to cross-examination and the statement is consistent with the declarant's testimony and is one of initial complaint of sexually assaultive behavior. La.Code Evid. art. 801(D)(1)(d); See State v. Ferguson, 540 So.2d 1116, 1119 (La.App. 1 Cir.1989).
Despite the state's claim, we believe that Ms. Ryals' testimony regarding the statements made by the children about the sexual abuse were offered for the truth of the matter asserted, and thus, hearsay. Ms. Ryals' detail of the children's statements went further than a possible explanation which could have been used to justify her urgency in seeking the order to place the children in state custody. Additionally, the statements made by the children to Ms. Ryals did not constitute the initial report of the sexual abuse. The initial report was actually made to Shay Hilton, the day before the statements were made to Ms. Ryals. Therefore, we do not agree with the trial court that State v. Tucker, 619 So.2d 1076 (La.App. 1 Cir. 1993),[3] can be used for authority to find that this testimony comes under the ambit of the initial report of sexual assaultive behavior. Thus, Ms. Ryal's testimony about the children's statements are not admissible as non-hearsay under La.Code Evid. art. 801(D)(1)(d).
Nor were the statements admissible under the hearsay exception as an excited utterance. La.Code Evid. art. 803(2) provides that a statement relating to a startling event or condition is not excluded by the hearsay rule if it was made while the declarant was under the stress of excitement caused by the event. There are two basic requirements for the excited utterance exception. There must be an occurrence or event sufficiently startling to render normal reflective thought processes of an observer inoperative. Additionally, the statement of the declarant must have been a spontaneous reaction to the occurrence or event and not the result of reflective thought. State v. Ferguson, 540 So.2d at 1119.
There are many factors that enter into determining whether in fact the second requirement has been fulfilled and whether a declarant was at the time of an offered statement under the influence of an exciting event. Probably the most important *1035 of these is the time factor. In this connection the trial court must determine whether the interval between the event and the statement was long enough to permit a subsidence of emotional upset and a restoration of a reflective thought process. State v. Yochim, 496 So.2d 596, 600 (La.App. 1 Cir.1986)
Herein, although the acts of abuse perpetrated against the victims allegedly took place over a four-year period, there is no evidence in the record as to when the last incident occurred. Thus, the statements made to the witness were not spontaneous reactions of the victims and we cannot say they fall within the excited utterance exception to the hearsay rule. Therefore, that portion of Ms. Ryals' testimony was inadmissible hearsay.
Next, we must determine whether the introduction of the hearsay was harmless error. When hearsay testimony is improperly introduced into evidence, it will be considered harmless error if it is found to be cumulative and corroborative of other properly admitted evidence and did not contribute to the verdict. State v. Reed, 97-812, p. 11 (La.App. 1 Cir. 4/8/98), 712 So.2d 572, 578-579, writ denied, 98-1266 (La.11/25/98), 729 So.2d 572. In order to establish that error was harmless in this case, the state must prove that the admission of improper hearsay did not contribute to defendant's conviction. Arizona v. Fulminante, 499 U.S. 279, 296, 111 S.Ct. 1246, 1257, 113 L.Ed.2d 302 (1991).
Herein, the record indicates that the prosecution also presented the videotaped statements of the victims themselves. In these statements, the children related details of the sexual abuse committed by their parents. Thus, while the testimony of Ms. Ryals may have been harmful to defendant, it was merely corroborative or cumulative of the direct evidence against defendant. Thus, we find that the state proved beyond a reasonable doubt that Ms. Ryals' hearsay testimony did not contribute to the jury's finding of guilt and that the verdicts could have been the same without this evidence.
This assignment of error lacks merit.

INEFFECTIVE ASSISTANCE OF COUNSEL
In assignment of error number two, defendant argues that defense counsel's failure to object to other hearsay evidence, admitted specifically through the testimony of Detective Pittman, Dr. Crafton, Dr. Turgeon and Dr. Curtis' medical report, constituted ineffective assistance of counsel. Defendant argues that but for the failure to object to this evidence, the verdict "may have been different."
Under La.Code.Crim. P. art. 841, a contemporaneous objection is required to preserve an error for appellate review. The purpose of the contemporaneous objection rule is to allow the trial judge the opportunity to rule on the objection and thereby prevent or cure an error. State v. Herrod, 412 So.2d 564, 566 (La. 1982). Without the allegation of ineffective assistance of counsel, we would dismiss this assignment of error for lack of a contemporaneous objection. However, because the defendant has asserted that she did not receive effective assistance of counsel, we shall consider the issue raised. See State v. Ratcliff, 416 So.2d 528, 532-533 (La.1982).
Additionally, we note that a claim for ineffective assistance of counsel is more properly raised by an application for post-conviction relief in district court, where a full evidentiary hearing may be conducted. However, where the record discloses evidence needed to decide the issue of ineffective assistance of counsel and that issue is raised by assignment of error on appeal, the issue may be addressed in the interest of judicial economy. State v. Williams, 632 So.2d 351, 361 (La.App. 1 Cir.1993), writ denied, 94-1009 (La.9/2/94), 643 So.2d 139.
The United States Supreme Court has established a two-part test for review of a convicted defendant's claim that his counsel's *1036 assistance was so defective as to require reversal of a conviction. In Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), the court stated:
First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the `counsel' guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable. Unless a defendant makes both showings, it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable.

Strickland, 466 U.S. at 687, 104 S.Ct. at 2064.
The inquiry must be directed to whether "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." Strickland, 466 U.S. at 694, 104 S.Ct. at 2068. In other words, absent the errors, would the fact finder have had a reasonable doubt concerning guilt. Strickland, 466 U.S. at 695, 104 S.Ct. at 2068-69. "In making this determination, a court hearing an ineffectiveness claim must consider the totality of the evidence before the judge or jury." Strickland, 466 U.S. at 695, 104 S.Ct. at 2069.
We agree that the testimony of Doctors Crafton and Turgeon, and the medical report of Dr. Curtis contained hearsay statements about the sexual abuse made by the children. However, these statements were made for purposes of medical treatment and diagnosis and were admissible under the hearsay exception of La.Code Evid. art. 803(4).
The testimony of Detective Pittman contained numerous instances of hearsay evidence, including the detective's testimony about the children's statements on the tape and to Dr. Curtis. We can find no hearsay exception that serves as the basis for the admission of that testimony. Also, the portion of Detective Pittman's testimony regarding Dr. Curtis' statements to him about the children's history of abuse contains double hearsay. Hearsay included within hearsay is not excluded if each part of the combined statements conforms with an exception to the hearsay rule. La.Code Evid. art. 805. Additionally, during Detective Pittman's testimony, the trial court found that Dr. Curtis was unavailable as a witness. La.Code. Evid. art. 804(B)(5) provides:
B. Hearsay exceptions. The following are not excluded by the hearsay rule if the declarant is unavailable as a witness:
* * * *
(5) Complaint of sexually assaultive behavior. A statement made by a person under the age of twelve years and the statement is one of initial or otherwise trustworthy complaint of sexually assaultive behavior.
Under the exception in La.Code Evid. art. 804(B)(5), the declarant of the complaint of sexually assaultive behavior (in the instant case, the children) must be the witness who is unavailable. Herein, it was Dr. Curtis, not the children, who was unavailable. Thus, this portion of Detective Pittman's testimony was not admissible under this exception.
However, after considering the totality of the evidence before the jury, we do not find a reasonable probability exists that, absent the error in admitting the hearsay portions of Detective Pittman's testimony, the jury would have had a reasonable doubt as to defendant's guilt. Even an unreasonable error does not warrant setting aside a conviction, if it had no effect on the verdict. State v. Tolliver, *1037 464 So.2d 1088, 1090 (La.App. 1 Cir.1985). The jury was unanimous in its verdict and obviously accepted the children's statements in the videotapes and the testimony of Doctors Crafton and Turgeon.
Herein, the defendant has not met her burden of showing that the decision reached would (not may as argued by defendant) reasonably have been different absent the error or errors. Defendant has failed to show sufficient prejudice to meet her burden. See State v. Sigur, 578 So.2d 143, 147-149 (La.App. 1 Cir.1990), writ denied, 582 So.2d 1303 (La.1991). Therefore, this error is harmless.
This assignment of error lacks merit.

EXCESSIVE SENTENCES
In assignment of error number three, defendant argues that the trial court imposed excessive sentences.[4] Specifically, she argues that because she has a "painful history herself of great trauma and abuse throughout her life and during her relationship with her husband", the sentences "purposefully inflict only more pain and suffering on her." The state counters that the sentences are not excessive and that the trial judge justified the sentences by considering the facts and circumstances of the crime and of the particular defendant. Defendant received the maximum sentences of seven years for her conviction for indecent behavior with juveniles and seven and one-half years for her conviction for attempted molestation of a juvenile when the offender has control or supervision over the juvenile. She also received maximum sentences of ten years at hard labor for each conviction of cruelty to juveniles.
Article I, Sec. 20, of the Louisiana Constitution prohibits the imposition of excessive punishment. A sentence may be both within the statutory limits and constitutionally excessive. State v. Sepulvado, 367 So.2d 762, 767 (La.1979). A sentence is excessive when it is grossly out of proportion to the severity of the offense or nothing more than the needless and purposeless imposition of pain and suffering. To determine whether a penalty is grossly disproportionate to the crime, the court considers the punishment and the crime in light of the harm to society and whether the penalty is so disproportionate as to shock our sense of justice. A trial court is given wide discretion in the imposition of sentences within statutory limits, and the sentence imposed by it should not be set aside as excessive in the absence of manifest abuse of discretion. State v. McKnight, 98-1790, p. 24-25 (La. App. 1 Cir. 6/25/99), 739 So.2d 343, 359-360.
This Court has stated that maximum sentences permitted under statute may be imposed only for the most serious offenses and the worst offenders, State v. Easley, 432 So.2d 910, 914 (La.App. 1 Cir. 1983), or when the offender poses an unusual risk to the public safety due to his past conduct of repeated criminality. See State v. Chaney, 537 So.2d 313, 318 (La. App. 1 Cir.1988), writ denied, 541 So.2d 870 (La.1989). A trial court's reasons for imposing sentence, as required by La.Code Crim. P. art. 894.1, are an important aid to this court when reviewing a sentence alleged to be excessive. State v. McKnight, 98-1790 at p. 25, 739 So.2d at 359.
Herein, in sentencing defendant, the judge stated that the crimes committed by the defendant are some of the worst crimes committed by anyone in our society and that these were some of the "most atrocious acts I've ever seen." He noted that the victims were young children about four or five years old, and that they had been subjected to sexual acts or made to watch their parents engage in sexual acts on a daily basis for several years. Additionally, the judge acknowledged that the children were also neglected and physically *1038 abused by their parents. While the judge noted that both the parents had severe problems with alcoholism, he did not find that the illness was a mitigating factor that would excuse their behavior. The judge further noted that he imposed the sentences on defendant for the same reasons he gave in imposing the sentences on co-defendant, Richard Hilton: that incarceration was necessary because of an undue risk that he would commit another crime, especially similar to the ones committed; that a pedophile is usually cured only by death; that he was in need of correctional treatment that could be provided by commitment to an institution; and that a lesser sentence would deprecate the seriousness of the crimes.
Finally, the judge noted that although these were defendant's first convictions, he was imposing maximum sentences. He believed that defendant knew or should have known that the victims were particularly vulnerable or incapable of resisting due to their ages, that the conduct manifested deliberate cruelty to the victims, that she used threats or actual violence in the commission of the offenses, and that the offenses resulted in significant and permanent injury to the young children. It is obvious that the judge found that defendant was the worst kind of offender and that the offenses were the most serious.
While we acknowledge defendant's status as a first felony offender, we believe that the reasons given by the trial court support the sentences. Considering the circumstances of the instant offenses, particularly the reprehensible nature of the crimes and the permanent effect that the offenses will have on the children, we believe that the defendant is one of the most egregious and blameworthy offenders. Thus, we find that the maximum sentences are supported by the record.
This assignment of error lacks merit.

PATENT ERROR
We note an error patent, pursuant to La.Code Crim. P. art. 920(2), which we have discovered. First, the minutes indicate that the trial court did not wait the required twenty-four hours after denial of defendant's motion for new trial and motion for post-verdict judgment of acquittal before imposing sentence. See La.Code Crim. P. art. 873. However, after ruling on the motions, the trial court indicated that it was ready to take up the sentencing. Defense counsel did not object. Since we can find no prejudice resulting from the court's failure to delay sentencing, this error is not reversible. See State v. Jones, 97-2521, p. 2, (La.App. 1 Cir. 9/25/98), 720 So.2d 52, 53.
CONVICTIONS AND SENTENCES AFFIRMED.
NOTES
[1] Retired Judge Ian W. Claiborne serving as judge pro tempore by order of the Supreme Court of Louisiana dated February 22, 2000.
[2] Richard Hilton, defendant's husband and the biological father of the victims, was identically charged in the same bill of information and tried jointly with defendant. He was found guilty as charged on all counts.
[3] In State v. Tucker, the defendant objected to the extensive testimony from a sexual abuse victim's therapist regarding what the victim, a very young child, had told her. The Court found that the statements "were clearly hearsay and were thus inadmissible" because they were admitted for the truth of the matter asserted, and the jury had no opportunity to evaluate the credibility of the victim as she did not testify. The Court then found that the error was not harmless.
[4] Defendant actually argues that the trial court imposed an excessive sentence, but does not indicate which particular sentence. Thus, we will review all of defendant's sentences for excessiveness.