|! GASKINS, Judge.
This matter, concerning the custody of a minor child, was filed by the plaintiff, G.N.S., against the child’s mother, S.B.S. The plaintiff contended that the mother abused the child. The trial court found that the defendant has a history of perpetrating family violence on the child and awarded the sole custody of the child to the plaintiff. Under the provisions of the Post Separation Family Violence Relief Act, La. R.S. 9:361 et seq., the court allowed the defendant only supervised visitation with the child, conditioned upon her participation in and completion of a treatment program. Under the Post Separation Family Violence Relief Act (PSFVRA), the defendant was also ordered to pay all costs of the proceedings. The defendant appeals the trial court judgment. For the following reasons, we affirm.
FACTS
The parties are the parents of the minor child at issue in this case. The child was *742 born in 1994 and the parties divorced in 1997. The parties were granted joint custody of the child. In a previous proceeding, and now in the instant case, the father alleged that the mother abused the child. In the first allegation, brought in November 1998, the trial court discounted the father’s allegations of sexual abuse; on May 28, 1999, the court denied the father’s request to modify custody. It is the second allegation of physical abuse that is before this court in the instant case.
After the ruling in the first hearing, the parties continued to have joint custody of the child. The exchange of the child was made at his child care facility. On June 14, 1999, the mother dropped the child off at 7:15 a.m. He spent the day at the facility and appeared to play and act normally. He |gwas picked up at 3:15 p.m. by his stepmother. She stated that the child was “pulling at himself’ but said that he did not need to go to the bathroom. He then told his stepmother that his “tee-tee” hurt. She asked what happened and the child related that his mother put him in hot water. He stated that he wet the bed at his mother’s house and she was angry. The child later said that his mother also struck him in the genital area with a wooden spoon.
After observing some redness in the genital area, the child was taken to the Willis-Knighton Pierremont emergency room by the plaintiff, the stepmother and the paternal grandparents. The emergency room physician, Dr. Jerry Davis, found only some redness in the genital area consistent with the child rubbing himself. However, because there were allegations of abuse, Dr. Davis notified Child Protection Services. He instructed the plaintiff to return if the child developed blistering.
The child spent the night with his paternal grandparents. The next morning, the paternal grandmother took the child to Dr. Regina Fakner, a pediatrician. Dr. Fak-ner discovered a burned area on the child’s abdomen consistent with contact with an object, not an immersion burn. Bruising was also noted in the child’s genital area and a history was given of being struck with a wooden spoon.
At the suggestion of Laura McFerren, a social worker who had been counseling the child, the boy was examined on June 16, 1999, by a child abuse expert, Dr. Ann Springer. Later, the mother was arrested for cruelty to a juvenile, but the Bossier District Attorney’s Office declined to prosecute her.
liiOn June 24, 1999, the trial court granted emergency provisional custody of the child to the father. A rule to show cause was set to modify child custody. The plaintiff sought application of the PSFVRA. The defendant answered, denying the allegations and claiming that the injuries occurred while the child was in the custody of the father. The defendant also sought sole custody of the child.
Trial on the matter commenced on August 31, 1999, and testimony was elicited intermittently until November 2000. On January 30, 2001, the trial court entered judgment in favor of the plaintiff, awarding him sole custody of the child. The defendant was found to have a history of perpetrating family violence against the child and she was allowed only supervised visitation, conditioned upon her participation in and completion of a treatment program under La. R.S. 9:362(7). Further, she was ordered to pay all court costs, attorney fees, evaluation fees, and expert witness fees, including the cost of medical and psychological care for the child necessitated by the family violence, together with legal interest.
In reasons for judgment, the court noted that accusations involving the child and *743 these parties were not new. In this matter, the plaintiff contended that the mother perpetrated acts of violence on the child for bed wetting, prior to the conclusion of her period of custody on June 14, 1999. The mother claimed that the acts of violence occurred after she returned the child to the father. The court noted that the Bossier District Attorney’s Office declined prosecution of the defendant in this matter and the Caddo District Attorney’s Office refused to bring charges against the father.
|4The court found that there was a “razor-thin window of opportunity” for either party to have inflicted the injuries on the child. The court reasoned that the standard of proof in this case was by a preponderance of the evidence. The court was not convinced beyond a reasonable doubt or by clear and convincing evidence that either party inflicted the injuries on the child. The court determined that by the slightest preponderance of the evidence, however, it was more probable than not that the injuries were caused by the mother. The court based this finding on the child’s repeated identification of his mother as the source of his injuries.
The defendant appealed the trial court judgment, raising numerous assignments of error.
MANIFEST ERROR
The defendant essentially argues that the trial court erred in finding that she inflicted the injuries on the child. In her assignments of error, the defendant contends that the trial court was manifestly erroneous in crediting and accepting the testimony of Dr. Springer, Dr. Brown and Ms. McFerren “over the overwhelming evidence contradicting their testimony and the internal inconsistencies of the testimony of each.” She also asserts that the trial court abused its discretion in awarding sole custody of the child to the plaintiff. The defendant further maintains that the trial court abused its discretion and was manifestly erroneous in finding that the injuries sustained by the child were inflicted by the defendant “in light of the overwhelming expert medical evidence and lay witness testimony to the contrary.” These arguments are without merit.
| ¡¿There is much dispute in this case as to when the child was injured and by whom. The plaintiffs current wife testified that she picked the child up at daycare on the afternoon of June 14, 1999. The stepmother was recuperating following surgery. The child complained of pain in the genital area. The stepmother observed some redness and swelling at that time. The child stated that his mother put him in hot water. After the child was taken to the emergency room, he spent the night with his paternal grandparents. He later clarified that his mother also hit him with a wooden spoon. The bruising was apparent the next day.
The child’s paternal grandmother testified that she and the grandfather kept the child on the evening of June 14,1999. She stated that the child was very uncomfortable and had difficulty sleeping that night. After the trip to the emergency room, the grandmother took one photograph of the injuries. She made additional photographs the next day.
The child’s paternal grandfather testified that on June 14, 1999, there was redness on the child’s stomach and scrotum. The witness stated that the child spent the night with them because his wife did not have to go to work the next day and would be better able to attend to the child’s needs throughout the night. The next day, the injuries were much darker.
The child’s father testified that he was contacted by his wife on the afternoon of *744 June 14. She reported to him that the child appeared to be injured after returning from daycare and visitation with the mother. When he got home, he asked the child what happened. The child said that his mother burned him in hot water because he wet the bed. Then he said something about his mother hitting him. The father asked if the mother |fiburned him or hit him. The child was unresponsive. Although somewhat confused, the father did not push the issue. The father examined the child and, upon observing redness in the genital area, thought that the child had been burned.
The child was taken to the emergency room and he was examined standing up by the physician on duty. The father was present in the emergency room when the child was examined. He testified that the emergency room doctor stated that blistering from the burn might come up later. He also claimed the doctor told him he was “not an expert on this kind of stuff.”
The child spent the night with his grandmother who took him to the pediatrician the next day because the bruising was worse. That afternoon, Russell Waller with Child Protection Services came to the father’s house, interviewed the child, and photographed the injuries.
The father made arrangements to take the child to Dr. Springer the next day. The father stated that the size of the marks on the child did not change from the first observation on June 14, but the coloring did. He testified that the coloring got darker and the swelling went down. According to the father, prior to this incident, the child was in therapy with Ms. McFerren. He was also being treated by Dr. Gregory Brown, a psychiatrist, who had prescribed medication for nightmares and aggression.
The child’s mother testified that on June 18, 1999, she allowed the child to sleep in the bed with her. On June 14, 1999, she awakened at 5:00 a.m. and discovered that the child had wet the bed. She claimed that he had been having problems with bed wetting since taking medication prescribed |7by his psychiatrist, Dr. Brown. She stated that the child took a bath that morning but the water was not too hot. He stayed in the bath 20-25 minutes. The child then ate breakfast and she took him to school. She denied harming the child and claimed that he was uninjured when she dropped him off at the daycare. The mother stated that she has struck the child to discipline him in the past. She also verified that she has a wooden spoon referred to in her household as a “hiney whacker.”
According to the mother, the child’s father called later on June 14 to inquire about medication that she forgot to leave at the daycare. He said the child had a rash or a burn. She informed him that the child had slept in urine part of the night. She was later arrested for cruelty to a juvenile, but the Bossier District Attorney’s Office declined prosecution. She refused to give a statement to Child Protection Services. The mother also denied trying to bribe the child to change his story with promises of presents and a new bed.
Dr. Jerry Davis, the emergency room physician at Willis Knighton Pierremont, was accepted at trial as an expert in emergency medicine. He stated that he examined the child on June 14, 1999. The chief complaint was “Privacy hurt and very red.” There was also a complaint of pain on urination and abuse was suspected. Some minor redness was noted on the penile shaft, but it was difficult to see any significant injury. The doctor stated that it looked like there had been some rubbing in the area by the child or by tight fitting clothing. There was no bruising and no *745 tenderness on palpation. There was also no report that the child had been hit on the penis. The father related concern that the child had been burned in hot | ¿water. Dr. Davis stated that it was very unlikely from what he observed that the child had been burned in hot water. The doctor called Child Protection Services as is the standard procedure any time there is evidence of physical trauma.
Dr. Davis was later questioned about a photograph of the injuries allegedly taken shortly after the visit to the emergency room on June 14. Dr. Davis stated that what he saw in the picture was not what he saw in the emergency room. He did say that it was possible that the picture could have been made shortly after he saw the child.
John Jeffcoat, the emergency room nurse, testified that the child was brought into the emergency room at 4:44 p.m. on June 14, 1999. His notes show that the child had been put in hot water by the mother a week earlier, after the child wet the bed. The child did not appear to be in pain. The child’s penis was red and swollen, consistent with rubbing. Mr. Jeffcoat did not see anything that looked like a hot water burn. No bruises were present and the child did not exhibit pain on palpation. He also said that the child was very quiet. He said on cross examination that bruising does not always show up immediately after trauma.
Dr. Regina Fakner was the pediatrician who examined the child on June 15, 1999. She observed a linear first degree burn and a deeply bruised penis. She did not think the burn was consistent with contact with hot water because the thighs, buttocks, feet and ankles were not involved. She did not observe the triangular burn that is apparent in photographs of the child’s injuries, only a linear mark that looked like a curling iron rod. She stated that a burn would leave a mark within 15 minutes and that she would have Lexpected the emergency room report to reflect some swelling with the amount of bruising that was present. She concluded that the injuries she observed were worse than those noted by the emergency room personnel and that the injuries in the photographs taken by Dr. Springer were more severe than those she had observed. She opined that the child was being reinjured after each doctor visit. Dr. Fakner claimed that she contacted Dr. Springer and discussed her opinion. However, Dr. Springer testified that Dr. Fakner called to discuss her nervousness over having to testify in court but did not discuss that she felt the child was suffering additional injuries.
Russell Waller with the Office of Community Services, investigated the reported child abuse. He talked with the father and with the child. They told him that the child wet the bed, resulting in abuse by the mother. Mr. Waller had the father leave the room and the child implicated his mother. Mr. Waller stated that he saw nothing that gave him concern about the father’s behavior. The father was cooperative with the investigation and the mother was not. The mother refused to talk with him on the advice of her attorney.
Dr. Springer testified that she examined the child on June 16, 1999. The child’s father and two employees of Child, Protection were present during the examination. She observed bluish-green bruising to the scrotum and healing redness of the penis and abdomen. She noted redness in a triangular distribution over the area above the penis and below the belly button. She also saw some burned areas on the upper half of the penis and stated that liquids can cause the burn patterns she observed. She stated that |inthe pattern may have *746 been caused by the child' scrunching up to avoid the water.
Dr. Springer stated that it appeared that the child suffered nonaccidental blunt force trauma to the scrotum consistent with being struck with a wooden spoon. She testified that it was possible that there was a period of time when the injuries were not apparent. She opined that the injuries she observed were 48-72 hours old. Dr. Springer said that the emergency room report described redness isolated to the penile shaft and the area just adjacent to it and that is what is depicted in the pictures of the injuries.
Dr. Springer testified that she thought the redness observed by Dr. Davis in the emergency room was early stage bruising. She maintained that all the injuries were present when the child was taken to the emergency room and that Dr. Davis saw it but did not know what it was. She stated that it is crucial to know where you are in the cycle of bruising to know what you are looking at. It was her opinion that abuse by the mother had taken place and the child would be in danger if placed back into that environment.
Dr. Edward Gustavson, a pediatrician who had done extensive work with abused children, testified by deposition. He was questioned about the proper way to obtain a history from a child making an accusation of abuse. He stated that the child should sit down with an unbiased interviewer and the questioning must be done in such a way as to get the truth and not what the child thinks the examiner wants to hear. Such an interview should last from 30 minutes to one and one-half hours. Dr. Gustavson said that |T interviews done by someone who has previously seen the child for therapy are generally not acceptable. He stated that it would be important to know how many people the child has spoken to before the forensic interview is attempted.
Dr. Gustavson was shown copies of some of the pictures of the child’s injuries. He stated that there were hematomas or blood blisters in the genital area which would have been visible almost immediately following injury. He also noted the triangular burn area and did not think that injury could have been caused by water. He stated that he thought the injuries occurred after the visit to the emergency room. He testified that no one can look at a bruise and accurately state when the injury occurred. He also stated that the injuries were consistent with having happened at different times. Interestingly, Dr. Gustavson also stated that in one of the pictures there was fecal matter on the sheet upon which the child was sitting. He noted clear indications in the anal area that the matter had just been expelled by the child. Counsel for both parties immediately pointed out that the doctor was looking at and referring to a leaf pattern on the bed sheet and not fecal matter.
Laura McFerren, a social worker who works with Dr. Brown, had been conducting therapy with the child. She was accepted as an expert in child and adolescent therapy. She first met the child on November 6, 1998. In January 1999, she stopped therapy because the child told her that his mother did not want him to talk to her anymore. This seemed so distressing to the child that Ms. McFerren made a clinical decision not to force the child to continue therapy. She stated that the child had post traumatic stress [^disorder, separation anxiety and was hypervigilent. Therapy was reestablished in March 1999.
In May 1999, the child became more guarded about discussing his mother and past abuse. Ms. McFerren spoke to the father on June 15 about the present incident and suggested an examination by Dr. *747 Springer. During subsequent therapy sessions, the child related that his mother became angry when he wet the bed and that she hit him with a wooden spoon while it was dark. According to Ms. McFerren, the detail with which a child relates an incident is an indicator of truthfulness. During some play sessions, the child acted out having a toy dog wet at various areas in a dollhouse. Ms. McFerren stated that acting out behavior cannot be coached. During subsequent sessions, the child made some sexually inappropriate comments to the therapist and acted aggressively. She stated that it is not uncommon when a child has been removed from an abusive situation to feel more at ease in expressing anger and sadness.
Ms. McFerren testified that she did not believe the child was coached to say that his mother harmed him. She testified that in determining whether a child has been coached, it is important to look at whether what he says is consistent with the physical evidence. She also stated that she believed the father was genuinely concerned for the child’s welfare and it was apparent that the child was not afraid of his father or stepmother, but he did state at times that he did not want to see his mother. The witness stated that the mother never called to discuss the child’s progress. Ms. McFerren also testified that after visitation with the mother was resumed, the child “shut down,” which she claimed “is what happens with abused children |13when perpetrators get their hands back on them. They coach them. And he had shut down, had a — had a guard up and wouldn’t discuss anything.”
Dr. Brown, the child’s psychiatrist, testified as an expert in child and adolescent psychiatry. He stated that the child suffered from post traumatic stress disorder. He had been treating the child since November 1998. The child had been given prescription medication, but there was a problem with not taking the medication when he was at his mother’s house. On June 22, 1999, Dr. Brown saw the child, who related that he had been struck with a spoon by his mother. The child conveyed that he was afraid of his mother. In viewing photographs of the injuries, Dr. Brown noted bruising of the penis and testicles and an immersion burn on the lower abdomen. Dr. Brown found the later development of the bruising on the child to be consistent with the child’s report of how the injuries occurred. According to Dr. Brown, the child’s version of his injuries was not consistent with coaching. This opinion was based on the physical evidence, the child’s description, and his reluctance to discuss it. Dr. Brown stated that in July 1999 the child began to have angry and aggressive outbursts and was more oppositional to females and resistant to going back to his mother’s household. The doctor stated that the child would not act this way with his abuser for fear of further abuse.
Prior to the reinstitution of supervised visitation between the child and the mother, the child was admitted to Brentwood Hospital for psychiatric treatment. On January 15, 2000, he was scheduled to have his first visitation with his mother since June 14, 1999. He began crying and was fearful and angry, asking if his mother was going to hurt him again. He |uasked for his father’s guns to kill himself. He also chased his stepmother through the house with a toy gun saying he was going to kill her. The child was hospitalized January 14-18, 2000.
On May 17-25, 2000, the child was again hospitalized in Brentwood. He exhibited increased outbursts of aggression and violent behavior including hitting and biting adults and peers at home and at school. He stated that he wanted to get a gun and *748 shoot his mother or run over her with a truck. Dr. Brown’s treatment notes from Brentwood indicate that, when faced with the prospect of visiting his mother, the child became angry and agitated.
Jennifer Toombs, a worker at the child’s daycare, testified that on June 14, 1999, the child never made any complaint of pain. When the incident at issue here occurred, the child was a new student at the daycare.
Joy Gross, the director of the daycare, stated that June 14 was the child’s fourth day there. Between July and the later part of the year, there were no problems with the child. However, as the proceedings progressed, around Christmas, the child’s behavior began to decline. He yelled and screamed, threatened to kill a teacher, and threatened to throw a chair on another child. When asked why he thought he could threaten a teacher, he stated that his “bad momma” told him he could. He stated that the defendant was his “bad momma” and that his father told him that.
Jewel Westcott, the child’s daycare teacher, stated that the child used bad behavior to get attention. He threatened to throw a chair, said that he hated her and threatened to bring a gun to school to shoot everyone. He stated that his father told him he did not have to mind at school. He also |1Bexhibited inappropriate sexual behavior by pulling his pants down and touching himself. A letter from the daycare was sent to the father stating that if the child’s behavior did not improve, he would not be allowed to attend.
Susan Vigen, an expert in psychology, specializing in children and family and with expertise in child abuse, testified at the hearing. She interviewed the child and his parents in January and February 1999, in connection with the prior allegations of sexual abuse and prior to the incident at issue here. She stated that the interviewing technique used by Ms. McFerren was flawed. According to Dr. Vigen, being questioned by a therapist he already knows can interfere with the objectivity of an interview of a child. She stated that it throws up a red flag when a child makes totally unsolicited statements. However, a child would be more likely to blurt out statements to someone he is comfortable with.
She testified that an investigative interview should be limited to 15 to 30 minutes. A clean and clear interview is more difficult after repeated interviews and the passage of time. Regarding the child’s declining behavior, she stated that when a child is taken out of a bad environment he will verbalize more, but his behavior will not get worse. She noted that in her prior contact with the parties, she spent a total of approximately three hours interviewing the child, but stated that her goal was a psychological evaluation.
Dr. Vigen found the child not to be an accurate reporter of events, citing an incident during her evaluation in which the child claimed that she | ^struck him. Ms. McFerren was present during the interview and it was clear that the child was not truthful.
The court questioned Dr. Vigen regarding the physical evidence in this case and the child’s consistent story to a number of people that his mother harmed him. She stated that a consistent statement when the child is in the same environment and brought in by the same person is not surprising. According to her, the child’s report would have been more believable if made to a neutral teacher at the daycare. She based her opinion that the child was not believable on the heavy level of contamination, the multiple interviews, the repeated questioning, the stress between the *749 homes, and the child’s psychiatric hospitalization.
Stacey Crawford was appointed to supervise the mother’s visitation with the child. She stated that the child always seemed excited to see his mother and her family. She claimed the child told the mother that he wished he could come back to her house, but his father said that he couldn’t. She testified that she always kept the child and the mother in her sight and hearing. She claimed that during one visitation, the child claimed that she and the mother hit him and burned his genitals. During one visit when the mother arrived late, Ms. Crawford questioned the child as to whether his stepmother ever hurt him and he replied affirmatively. Ms. Crawford claimed that she never observed the child’s mother harm him during visitation.
Legal Principles
The parties in the present case agree that the applicable standard of proof is by a preponderance of the evidence. An appellate court may not set 117aside a trial court’s finding of fact unless it is clearly wrong. Where there is conflict in the testimony, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review, even though the appellate court may feel that its own evaluations and inferences are as reasonable. If two permissible views of the evidence exist, the fact finder’s choice between them cannot be manifestly wrong. When the fact finder’s conclusions are based on determinations of the witnesses’ credibility, the manifest error standard requires great deference to the trier of fact, since only the trier of fact observes the variations in demeanor and tone of voice that bear so heavily on the listener’s understanding and belief in what is said. If a trier of fact’s findings are reasonable in light of the record reviewed in its entirety, the court of appeal may not reverse even if convinced that if it had been sitting as trier of fact, it would have weighed the evidence differently. Foster v. Clarendon National Insurance, 32-646 (La.App.2d Cir.3/1/00), 753 So.2d 968.
The issue for the appellate court is not whether the trier of fact was wrong, but whether the fact finder’s conclusions were reasonable. When expert witnesses give differing testimony, the trier of fact must determine which evidence is most credible. Foster v. Clarendon National Insurance, supra. The trial judge, having observed the witnesses, is in the best position to determine credibility. A trial court’s determination of child custody is entitled to great weight and will not be disturbed on appeal absent a clear abuse of discretion. Lewis v. Lewis, 34,031 (La.App. 2d Cir.11/30/00), 771 So.2d 856. It is well-settled that a court of appeal may not set aside a 11Rtrial court’s or a jury’s finding of fact in the absence of “manifest error” or unless it is “clearly wrong.” Rosell v. ESCO, 549 So.2d 840 (La.1989).
In custody cases, the paramount consideration is always the best interest of the child. La. C.C. art. 134; Simmons v. Simmons, 26,414 (La.App.2d Cir.1/25/95), 649 So.2d 799; McGee v. McGee, 98-1911 (La.App. 3d Cir.10/13/99), 745 So.2d 708. The two parties stand on equal footing at the outset of trial,, and the court determines the best interest of the child based on the relative fitness and ability of the competing parties in all respects. Consequently, each case must be decided on the basis of its particular facts and circumstances by weighing and balancing those factors favoring and opposing custody of the respective parents. McGee v. McGee, supra.
*750 Discussion
The defendant claims that the trial court erred in finding that she abused the child. She asserts that the evidence shows that no injuries were present when the child was taken to the emergency room, but they were present the next day. She argues that Dr. Springer’s testimony was inconsistent in saying that the burns and bruises were present during the emergency room examination and then later saying that the injuries were present, but were not noted by Dr. Davis because he did not know what he was looking at. She cites Dr. Gustavson’s testimony that the injuries would have been immediately visible. She also points out Dr. Fakner’s opinion that the child was suffering additional injuries after each doctor’s visit. The defendant asserts that Dr. Brown’s conclusion that the defendant abused the child was based on invalid information.
|1BAs is clear from the testimony outlined above, there is a conflict in the testimony as to how the child was injured. After weighing and evaluating all the testimony, the trial court concluded by a preponderance of the evidence that the defendant inflicted the injuries on the child. The decision on the issues presented required evaluation of credibility, inferences of fact, and a choice between two permissible views of the evidence. After reviewing the record, we find that the trial court’s decision was reasonable. The child consistently stated that he wet the bed, his mother was angry, she put him in hot water and struck his genital area with a spoon. The child also stated that this occurred when it was dark. The mother confirmed that on the morning in question, the child had wet the bed and was given a bath at around 5:00 a.m. The emergency room report from the afternoon of June 14, 1999, reflects that there was redness and swelling in the child’s genital area. Over the next two days, the burns and bruises became more obvious. There was expert medical testimony that this was consistent with the normal progression of such injuries. In addition, the record shows that the child behaves as an abused child and exhibited anxiety about visiting the mother sufficient to warrant psychiatric hospitalization. After resumption of supervised visits with the mother, the child’s behavior at home and at daycare deteriorated. Based upon the record before us, we do not find that the trial court abused its discretion in finding that the mother was responsible for the child’s injuries.
HEARSAY
The defendant claims that the trial court erred in admitting into evidence hearsay statements of the child. She objects to statements made by | gpthe child to Dr. Springer, Dr. Brown and Ms. McFer-ren. According to the defendant, there were no indicia of reliability as to these statements, the child never testified at trial and the court never sought to determine the competency of the child. She objects that no valid forensic interview of the child was conducted and contends that the plaintiff, his wife, or his parents were always present when the child spoke to Dr. Springer, Dr. Brown, or Ms. McFerren.
At trial, when the defendant entered an objection to statements made by the child, the court overruled it, finding an exception to the hearsay rule for statements made to receive medical treatment. The court also noted that La. C.E. art. 1101 provides for limited applicability of the rules of evidence in cases involving child custody. We find no error in the court’s ruling.
La. C.E. art. 803(4) provides:
The following are not excluded by the hearsay rule, even though the declarant is available as a witness:
[[Image here]]
*751 (4) Statements for purposes of medical treatment and medical diagnosis in connection with treatment. Statements made for purposes of medical treatment and medical diagnosis in connection with treatment and describing medical history, or past or present symptoms, pain, or sensations, or the inception or general character of the cause or external source thereof insofar as reasonably pertinent to treatment or diagnosis in connection with treatment.
The child made statements to health care professionals for purposes of medical treatment and diagnosis. State v. Hilton, 99-1239 (La.App. 2d Cir.3/31/00), 764 So.2d 1027. Also, the rules of evidence have limited application in child custody cases. La. C.E. art. 1101(B)(2) provides in pertinent part:
li^B. Limited applicability. Except as otherwise provided by Article 1101(A)(2) and other legislation, in the following proceedings, the principles underlying this Code shall serve as guides to the admissibility of evidence. The specific exclusionary rules and other provisions, however, shall be applied only to the extent that they tend to promote the purposes of the proceeding....
(2) Child custody cases.
In Folse v. Folse, 98-1976 (La.6/29/99), 738 So.2d 1040, the supreme court found that in a child custody case under the PSFVRA, hearsay statements of the child are admissible. The court reasoned that the legislature has recognized that the best interests of the child are not served by strict application of the rules of evidence. In the instant case, the trial court had before it the context in which the statements were made, i.e., the court was aware of those instances in which the father, his wife or his parents were present when statements were made. When hospitalized, however, the child’s reactions and statements regarding his mother were made when no relatives were near. The court also had information regarding the “spontaneity and consistent repetition, mental status of the declarant” and other factors bearing on the reliability of the statements. See Folse v. Folse, supra. Given the factors outlined in Folse that often weigh against traumatizing a young child by requiring him to testify in court against a parent, we find that the trial court did not err in allowing the hearsay statements of the child into evidence and then making determinations as to the credibility and weight to be given those statements.
ULTIMATE ISSUE OF FACT
The plaintiff argues that the trial court erred in basing its opinion on the credibility determinations of the child by Dr. Springer, Dr. Brown, andJ^Ms. McFer-ren, and by allowing them to testify to the ultimate issue of who inflicted the injuries on the child. She argues that a foundation was not established for the reliability of the evidence on which the opinion was based or that the foundation was proven false. This argument is without merit.
La. C.E. art 704 provides in pertinent part:
Testimony in the form of an opinion or inference otherwise admissible is not to be excluded solely because it embraces an ultimate issue to be decided by the trier of fact....
Under this article, in a civil case, it was permissible to allow the experts to offer opinions or inferences on the ultimate issue to be decided by the trier of fact. Regarding the foundation for such testimony, as discussed above, the trial court was aware of the qualifications of the experts as well as the factors upon which the opinions were based. The trial court was also *752 aware of the factors presented by the defendant in furtherance of her claim that the opinions were based upon invalid information. The court then weighed the evidence and made its own determination of credibility. We find that the trial court did not err in this regard.
ADMISSIBILITY OF PHOTOGRAPH
The defendant argues that the trial court erred in' allowing into evidence a photograph of the child found by his paternal grandmother after the trial had begun. The photo was the only one taken immediately after the trip to the emergency room and the grandmother claimed that she forgot that she had it. This argument is without merit.
The child’s grandmother claimed that on the day the injury was discovered, June 14, 1999, she took one Polaroid photo of the injuries after | ^returning home from the emergency room. However, she deemed the picture not to be clear and put it in a dresser drawer at home. She later obtained some film and took other pictures as the bruising developed. While the trial was in progress, she ran across the photo and gave it to the plaintiff. At that point, the issue of the timing of the injuries had become important. As soon as plaintiffs counsel became aware of the picture, he informed the defendant’s counsel and the court of its existence. The plaintiff moved to amend his discovery response and present the photograph during the course of the defendant’s case. The plaintiff sought to admit the picture over the defendant’s objection. The trial court ruled that the plaintiff could use the photograph and the defendant would be granted surrebuttal to remedy any resulting prejudice. The defendant filed a writ application on the issue to this court which was denied on the showing made. The defendant now argues that the trial court erred in allowing the picture to be admitted into evidence.
In this case, the defendant was informed of the existence of the photograph as soon as the plaintiff became aware of it. The defendant was then allowed to call witnesses to rebut the plaintiffs contention that the photo reflected the child’s injuries on June 14, 1999. Any prejudice that the defendant might have suffered was thus remedied. Cf. McGuire v. Serigny, 428 So.2d 1084 (La.App. 1st Cir.1983). Therefore, we find no error in the admission of the photograph.
ALLEGATIONS OF PRIOR ABUSE
The defendant objects to evidence and references to allegations of prior abuse. She claims that she was not given notice that the plaintiff [ ¡^intended to introduce this kind of evidence. She also contends that in the prior proceeding, the trial court did not find sufficient evidence to support the allegations of abuse. This argument is without merit.
The record shows that the issue of prior allegations of abuse was elicited by the defendant’s attorney in her cross examination of the plaintiff. Obviously, she had no objection to the line of questioning at that time. Under these circumstances, she cannot now raise this as error.
Further, we note that the trial judge in this case also conducted the hearing regarding the prior claims of abuse and was well aware of these allegations. Finally, La. C.C. art. 134 provides that the court shall consider all relevant factors in determining the best interest of the child. Testimony regarding prior conduct may be relevant to a custody determination. See Hargrove v. Hargrove, 29,590 (La.App. 2d Cir.5/9/97), 694 So.2d 645. Under the facts of the present case, we find no error in the reference to prior abuse made during several witnesses’ testimony.
*753 APPLICABILITY OF THE PSFVRA
The defendant asserts that the trial court erred in applying the provisions of the PSFVRA to order her to undergo counseling, to have supervised visitation and to pay all costs. In assessing her with costs, the defendant argues that the court made no determination as to what were necessary costs as required by the PSFVRA. These arguments are without merit.
Because we find no error in the trial court’s conclusion that the defendant abused the child and had a history of family violence, we find |a5that the court did not err in imposing the restrictions required by La. R.S. 9:364, which provides in pertinent part:
A. There is created a presumption that no parent who has a history of perpetrating family violence shall be awarded sole or joint custody of children. The court may find a history of perpetrating family violence if the court finds that one incident of family violence has resulted in serious bodily injury or the court finds more than one incident of family violence.
[[Image here]]
C. If the court finds that a parent has a history of perpetrating family violence, the court shall allow only supervised child visitation with that parent, conditioned upon that parent’s participation in and completion of a treatment program. Unsupervised visitation shall be allowed only if it is shown by a preponderance of the evidence that the violent parent has completed a treatment program, is not abusing alcohol and psychoactive drugs, and poses no danger to the child, and that such visitation is in the child’s best interest.
Also, the trial court did not err in imposing upon the defendant costs necessitated by the family violence in accordance with La. R.S. 9:367, which provides:
In any family violence case, all court costs, attorney fees, evaluation fees, and expert witness fees incurred in furtherance of this Part shall be paid by the perpetrator of the family violence, including all costs of medical and psychological care for the abused spouse, or for any of the children, necessitated by the family violence.
The defendant has cited no authority in support of her argument that the necessity costs and expenses must be predetermined by the court at the time they are imposed. Also, the defendant has not made a claim that any costs or expenses incurred in this case are unnecessary or abusive. Accordingly, the defendant has failed to demonstrate a violation of La. R.S. 9:367.
| ^CONCLUSION
For the reasons stated above, we affirm in all respects the trial court judgment in favor of the plaintiff, G.N.S., and against the defendant, S.B.S. Costs in this court are assessed to the defendant.
AFFIRMED.