CRAIN, J.
| aThe defendant, Jeremy Wilson, was convicted of two counts of second degree murder and sentenced to two consecutive terms of life imprisonment at hard labor without benefit of probation, parole,. or suspension of sentence. We affirm.
FACTS AND PROCEDURAL HISTORY
On March 8, 2008, the Washington Parish Sheriffs Office responded to a residential fire in Franklinton and discovered two bodies, burned beyond recognition. The victims were later identified as Donald Wayne. Demille Williams and Kimberly Sims (or Simms), who both lived at the residence. During an autopsy, bullet fragments were recovered from the victims’ bodies and it was determined they both *40 died of gunshot wounds to the head before their bodies were burned. The police recovered bullet and casing fragments at the crime scene, but found no evidence of traceable fire accelerant.
Initially, police identified as suspects, interviewed, and arrested Ricky Magee, Monica Simmons, and Andrew James; however, the murder investigation remained open. Then, in October 2008, Britney Farrell contacted police and said the defendant confessed to her that he and Erick Townsend shot the victims during a robbery, then burned the house to destroy any evidence. She later recanted her statement. At trial she denied any memory of any statements, but identified her voice after reviewing the recordings.
After Farrell gave statements to police, Townsend was arrested on unrelated charges and provided information that led police to recover three guns from Jamie-son Creek and to conduct further investigation. Townsend was then indicted with the defendant for two counts of first degree murder. The cases were severed and Townsend pled guilty to two counts of manslaughter in exchange for his- agreement to testify at the defendant’s trial. However, when the state called laTownsend to testify, he refused to answer questions despite the trial court finding he had no Fifth Amendment right against self-incrimination to invoke and threatening him with its contempt power.
Information from Townsend led police to interview the defendant’s wife, Felicia Brewer. Brewer implicated the defendant in the crimes, stating on the night of the murders she drove the defendant and Townsend to what she thought was a drug deal. She said she waited in the car and when the two men returned they were wearing masks, bloody gloves, and had changed clothes. She also described driving to Jamieson Creek where Townsend disposed of three guns. Like Farrell, Brewer later recanted her statement; however, at trial, Brewer testified her original statement to police implicating the defendant in the crimes was truthful.
The defendant maintained his innocence and accused Ricky Magee and Monica Simmons of the murders. However, Monica Simmons invoked her Fifth Amendment right against self-incrimination and refused to testify at trial, as did Paul Robinson, who gave a statement saying Ricky Magee confessed to him. Over the defendant’s objection that he was being denied his right to present a defense, the trial court refused to allow the defendant to admit the out-of-court statements to police into evidence and ruled other witnesses would not be allowed to testify about hearsay statements.
The jury convicted the defendant of two counts of second degree murder, responsive verdicts to his indictment on two counts of first degree murder.
SUFFICIENCY OF THE EVIDENCE
On appeal, the defendant contends the evidence was insufficient to support his convictions, arguing there was no physical evidence against him and the testimony of witnesses who implicated him was not credible.
14A conviction based on insufficient evidence cannot stand, as it violates due process. See U.S. Const. amend. XIV; La. Const. art. I, § 2. In reviewing claims challenging sufficiency of evidence, an appellate court must determine whether any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt based on the entirety of the evidence, both admissible and inadmissible, viewed in the light most favorable to the prosecution. See Jackson v. Virginia, 443 U.S. 307, 319, 99 S.Ct. 2781, *41 2789, 61 L.Ed.2d 560 (1979); State v. Oliphant, 13-2973 (La. 2/21/14), 133 So.3d 1255, 1258-59; see also La. Code Crim. Pro. art. 821B; State v. Mussall, 523 So.2d 1305, 1308-09 (La. 1988). When circumstantial evidence forms the basis for conviction, the evidence, “assuming every fact to be proved that the evidence tends to prove ... must exclude every reasonable hypothesis of innocence.” La. R.S. 15:438; Oliphant, 133 So.3d at 1258. The due process standard does not require the reviewing court to determine whether it believes the witnesses or whether it believes the evidence establishes guilt beyond a reasonable doubt. State v. Mire, 14-2295 (La. 1/27/16), — So.3d-, - (2016 WL 314814). Rather, appellate review is limited to determining whether facts established by direct evidence and inferred from the circumstances established by that evidence are sufficient for any rational trier of fact to conclude beyond a reasonable doubt that the defendant was guilty of every essential element of the crime. State v. Alexander, 14-1619 (La.App. 1 Cir. 9/18/15), 182 So.3d 126, 129-30, writ denied, 15-1912 (La. 1/25/16), 185 So.3d 748. The weight given evidence is not subject to appellate review; therefore, evidence will not be reweighed by an appellate court to overturn a fact finder’s determination of guilt. State v. Cobb, 13-1593 (La.App. 1 Cir. 3/27/14), 144 So.3d 17, 24.
When the defendant’s identity as the perpetrator of a crime is the key issue, the state is required to negate any reasonable probability of misidentifícation. State v. Neal, 00-0674 (La. 6/29/01), 796 So.2d 649, 658, cert. denied, 535 U.S. 940, 122 S.Ct. 1323, 152 L.Ed.2d 231; State v. Carter, 14-0742 (La.App. 1 Cir. 3/25/15), 167 So.3d 970, 976, Positive identification by only one witness is sufficiént to support a conviction. Neal, 796 So.2d at 658; Carter, 167 So.3d at 976.
As it relates to this case, second degree murder is the killing of a human being when the offender has a specific intent to kill or to inflict great bodily harm. See La. R.S. 14:30.1A(1). Specific criminal intent is “that state of mind which exists when the circumstances indicate that the offender actively desired the prescribed criminal consequences to follow his act or failure to act.” La. R.S. 14:10(1). Specific intent may be formed in an instant. State v. Mickelson, 12-2539 (La. 9/3/14), 149 So.3d 178, 182. Because it is a state of mind, specific intent need not be proven as a fact, but may be inferred from circumstances surrounding the defendant’s actions. Mickelson, 149 So.3d at 182.
Felicia Brewer was granted immunity from prosecution and, at trial, testified she was with the defendant and Erick Townsend on the night of the murders. She explained that the two men wanted pills, so late that night she drove them to a wooded location in a car that belonged to the defendant’s sister, which she could only describe as green. The defendant and Townsend exited the car and told her to wait down the street. Brewer recalled Townsend carrying an opaque drawstring bag. She claimed she became worried when they did not quickly return and tried reaching them by cell phone, and Townsend called her back and said they were returning to the vehicle. She testified the defendant and Townsend came running out of the woods dressed in different clothes, wearing Jason and Scream costume masks and bloody latex gloves. They got back into the car and the defendant screamed at her to drive away.
Brewer testified she was scared and drove away with the defendant in the |fifront passenger seat and Townsend in the back passenger seat. She recalled the two men arguing because Townsend wanted to tell her what went on in the house. *42 She stated she turned and saw Townsend had guns on his lap, which he was wiping with what she guessed was a black shirt. She also noticed a scratch on the left side of the defendant’s neck. She said Townsend’s bloody gloves were falling apart and “[t]here was blood everywhere” and all over Townsend.
Brewer explained the defendant said to stop at “the creek,” where Townsend threw three guns out of the car. She stated while they were in the car the two men removed the outer clothes they were wearing over their original attire. When asked what happened to the outer clothes, Brewer said she had no personal knowledge, but knew what happened to the clothes because Townsend told her.[1] Brewer could not recall details about the clothes the men were originally wearing.
Brewer testified she did not know the victims, did not know where they lived, and did not go to their house on the night of the murders, explaining that she let the defendant and Townsend out of the car at a wooded area near the main road. She also denied seeing the victims’ house burning or smelling smoke. However, she testified she knew about the fire. She also indicated she never experienced a more terrorizing, scary situation.
At trial, Brewer acknowledged she previously gave inconsistent and conflicting accounts of that night’s events. She testified she was arrested twice and gave two statements to police consistent with her trial testimony. She testified after giving the statements to police, the defendant’s parents drove her to defense counsel’s office, where, in an attempt to get the defendant (her husband and the father of her child) out of jail, she said she lied to police, telling them that she and the defendant were in Baton Rouge at the time of the murders, and neither she nor 17the defendant participated in the crimes. Though she acknowledged that in statements to defense counsel she recanted her police statements and executed an affidavit to that effect, Brewer testified her trial testimony, which was consistent with her statements to police, was truthful and she made a mistake speaking with defense counsel. Brewer also acknowledged she was subpoenaed to testify at trial and was given immunity from prosecution. Brewer indicated that the immunity offer essentially prohibited the state from using information directly or indirectly derived from her trial testimony, but did not ensure she could not be charged with a crime related to the underlying events, which gave her reason to believe she may face criminal charges. Brewer further acknowledged that her statement to police that Townsend threw the guns into the creek was made after police showed her pictures of the creek where the guns were found.
The state granted Britney Farrell immunity from prosecution and called her as a witness at trial. Farrell testified the defendant is the father of her two children, and though she has no contact with him, she does have contact with his family who visit the children monthly. She denied having firsthand knowledge of the crimes, but admitted that she contacted police and gave taped statements concerning the defendant’s involvement in the crimes. However, Farrell stated she could not remember the contents of the statements.
Farrell testified she had recently reviewed tapes of her statements and confirmed hearing herself tell police in December 2008, the defendant told her he and Townsend went to the victims’ house to rob them. She confirmed hearing herself *43 tell police she was told Sims answered the door to the defendant and Townsend, who were wearing masks, then ran down the hall. Townsend panicked and shot Sims, then the defendant shot Williams, who lay in bed. She confirmed hearing herself tell police the defendant told her he and Townsend burned down the house to avoid leaving evidence and, as an alibi, would claim to have been in 18Baton Rouge. Additionally, she confirmed she informed , police the defendant had a silver automatic gun, and Townsend had not told her anything.
. Farrell admitted she heard herself on tape, and the defendant could have told her all of that, but maintained she did not remember him doing so. She confirmed that at the time of her interview, the defendant and his family were seeking custody of her children, and stated she could not remember if she fabricated the statements to win custody — she did not believe she lied, but testified she did not remember what she said. She denied memory of telling police her decision to report what the defendant told her was based on the defendant’s attempt to gain custody of the children, but admitted she heard her voice on tape make that statement.
Farrell confirmed she gave a video recorded statement on March 29, 2009, where she stated the defendant never confessed anything to her. Again, she admitted hearing her voice give the statement, but denied memory of it. Farrell also acknowledged she visited defense counsel’s office, where she. signed an affidavit denying knowledge of the murders, denying discussing the crimes with the defendant, and denying the defendant confessed any criminal activity to her, but, again, claimed she could not remember it.
Farrell stated she was subpoenaed to testify and after she was served, the defendant’s family took custody of her children. She denied outside pressure to not remember her statements.- She acknowledged listening to the entirety of her taped statements, and no one fussed at her or told her what to say in the statements. She agreed she initiated contact with police, but did not remember the statements themselves. She acknowledged she probably remembered more when the statements were made than at trial.
On .cross examination, Farrell acknowledged that her video statement -showed her telling' police the defendant told her nothing, consistent with the | 9affidavit executed in defense counsel’s office. She also acknowledged that in the video she stated she and the defendant were in a custody dispute and were on bad terms. She maintained she could not remember meeting with police or stating that the defendant never told her anything. She admitted calling defense counsel after being subpoenaed for trial and expressing concern that she may get in trouble. She then, again, acknowledged the state granted her immunity from prosecution.
. The state also presented- testimony regarding-the police investigation. Detective Guy Magee, retired from the Washington Parish Sheriffs Office, was lead detective and testified regarding evidence collected at the scene of the fire, including a possible copper bullet fragment and a fired .380 bullet casing. Detective Magee explained numerous individuals were interviewed, and the investigation initially focused and Monica Simmons, Andrew James and Ricky Magee (no relation to Detective Ma-gee), who was interviewed multiple times. Those three suspects were arrested for first degree murder after Detective Magee completed affidavits of probable cause.
Warden Jim Miller of the Washington Parish Sheriffs Office testified he participated in the murder investigation as a detective; He said Britney Farrell called him months after the murders and provid *44 ed the information leading to her December 2008 statement that the defendant admitted he and Townsend committed the crimes. The case remained open and the investigation continued. He said Townsend was then arrested on an unrelated charge and asked to speak with an investigator. Detective Magee explained that in March 2009, Townsend gave a handwritten statement; then in July 2009, Townsend gave a recorded statement, which, prompted by a question asked by Townsend, included discussion of possible verdicts and the lesser offense of manslaughter.
Detective Miller testified he spoke with Townsend on more than one occasion, and information Townsend provided led police to speak with other 11flindividuals, including Felicia Brewer. Though Brewer claimed she made cell phone calls and spoke with Townsend after he exited the car on the night of the murders, Detective Miller confirmed records for the phone numbers Brewer provided did not include any relevant calls or data for the requested time frame. Detective Miller noted the cell phones were considered disposable, that Brewer provided two phone numbers although there were three people, and expressed uncertainty about at least one of the phone numbers. Detective Miller also said information Townsend provided led police to recover three guns from Jamie-son Creek.
The state presented testimony by Charles R. Watson, Jr., a forensic scientist who testified as an expert in the field of firearms examination. Based on evidence collected in the victims’ autopsies, Watson concluded each victim was shot twice with different guns. Watson examined three firearms recovered from the creek — two .380 caliber semi-automatic pistols and a .22 caliber revolver — but could not determine how long they were in the creek. Due to damage to the bullet and cartridge casing fragments collected as evidence, he was unable to confirm whether the bullets were fired from the three guns in evidence. However, Watson did conclude each victim was shot with a .22 caliber bullet and a .380 auto caliber bullet.
More than a year after the murders, Detective Miller obtained a search warrant for a green Ford Escort believed to have been used in the commission of the crimes. The vehicle was in the back field of the house belonging to defendant’s father and, when it was seized, was missing the front passenger seat. The defendant’s father, Talmus Wilson, Sr., said he owned the car, which was used by his three daughters and other family members, and that he removed the passenger seat to haul scrap to the junkyard. Mr. Wilson denied seeing cuts or stains on the seat before removing it, or seeing anything suspicious or out of the Inordinary in the vehicle. Crime lab testing revealed no trace evidence of blood in the vehicle.
When a case involves circumstantial evidence and the jury reasonably rejects the hypothesis of innocence presented by the defense, that hypothesis falls, and the defendant is guilty unless there is another hypothesis which raises a reasonable doubt. State v. Moten, 510 So.2d 55, 61 (La. App. 1 Cir.), writ denied, 514 So.2d 126 (La. 1987). As the fact finder, a jury is free to accept or reject, in whole or in part, testimony of any witness. Moreover, when there is conflicting testimony about factual matters, and resolution depends upon a determination of the credibility of witnesses, the matter is one of weight of evidence, not sufficiency. An appellate court will not reweigh evidence to overturn a fact finder’s determination of guilt. State v. Taylor, 97-2261 (La.App. 1 Cir. 9/25/98), 721 So.2d 929, 932. Moreover, even if the record contains some evidence which conflicts with testimony accepted by *45 a trier of fact, such evidence does not render the evidence accepted by the trier of fact insufficient, State v. Quinn, 479 So.2d 592, 596 (La. App. 1 Cir. 1985).
Viewing the evidence presented in the light most favorable to the state, particularly statements by Felicia Brewer and Britney Farrell that implicated both the defendant and Townsend, and evidence the victims were killed with bullets of calibers consistent with the guns recovered from Jamieson Creek, we cannot say the jury’s determination that the state proved all elements of second degree murder was irrational. See State v. Calloway, 07-2306 (La. 1/21/09), 1 So.3d 417, 418 (per curiam ); State v. Ordodi, 946 So.2d 654, 662 (La. 2006).
The evidence presented at trial was sufficient to support the jury’s verdicts.
EXCLUSION OF EVIDENCE
At trial, the defense indicated it intended to call as witnesses Monica Simmons and Ricky Magee, who the defendant contends are guilty of these lacrimes, along with Paul Robinson, Carla Simmons, and Elissa Smith, who gave statements that included statements made to them by Monica and Ricky. Monica and Paul invoked their Fifth Amendment rights against self-incrimination and refused to testify.[2] The defendant then sought to introduce their out-of-court statements as evidence. The trial court held statements by Monica and Paul to police were inadmissible hearsay, and ruled Carla and Elissa would not be allowed to testify about hearsay statements Monica allegedly made to them. The defense objected, contending the trial court’s ruling prevented them “from bringing the necessary linkage testimony that would then get to other testimony,” explaining though some witnesses were present and willing testify, their testimony “would be improper unless it was in response to the prohibited testimony.” Ricky was present and willing to testify, but the defense did not call him as a witness, explaining in its motion for new trial that “[Ricky’s] testimony was of no value to the defense given the fact that without the testimony of Paul Robinson, the defendant could not impeach the anticipated testimony of Ricky Magee denying that he had killed [the victims].” The defense proffered statements made to police by Monica, Ricky, Paul, Carla, Elissa, Bobby Ray Dillon, and Ms. Freddie Williams. Now, on appeal, the defendant contends the trial court violated his constitutional right to present a defense by excluding the witnesses’ statements.
We first consider whether the trial court correctly ruled the statements were inadmissible hearsay. Hearsay is a statement, other than one made by the declarant while testifying at the present trial or hearing, offered in evidence to prove the truth of the matter asserted. La. Code Ev. art. 801C. Generally, hearsay is not admissible except as allowed by the Louisiana Code of Evidence or other | ^legislation. La. Code Ev. art. 802. If a declarant is “unavailable” as a witness at trial, certain statements are excepted from, and not excluded by, the hearsay rule. La. Code Ev. art. 804. One such exception is a statement against interest, defined as “[a] statement which was at the time of its making so far contrary to the declarant’s pecuniary or proprietary interest, or so far tended to *46 subject him to civil or criminal liability, or to render invalid a claim by him against another, that a reasonable man in his position would not have made the statement unless he believed it to be true.” La. Code Ev. art. 804B(3). However, this exception does not apply to “[a] statement tending to expose the declarant to criminal liability and offered to exculpate the accused... unless corroborating circumstances clearly indicate the trustworthiness of the statement.” La. Code Ev. art. 804B(3). Furthermore, even if the declarant is available as a witness, the hearsay rule does not exclude a statement constituting a present sense impression, an excited utterance, or a statement of the declarant’s then existing state of mind. La. Code Ev. art. 803.

Monica Simmons, Carla Simmons, and Elissa Smith

By invoking her Fifth Amendment right not to testify, Monica Simmons was an “unavailable” witness. See La. Code Ev. Art. 804; State v. Coleman, 14-0402 (La. 2/26/16), 188 So.3d 174, 194, cert. denied, — U.S.-, 137 S.Ct. 153, 196 L.Ed.2d 116 (2016). Carla Simmons and Elissa Smith were available witnesses; however, the trial court ruled they could not testify regarding statements Monica made to them.
Monica was interviewed by detectives on March 18, 2008, approximately ten days after the murders. She told detectives she was at Andy James’ house “getting loaded” on the night of the murders. She said Ricky Magee arrived there late that night and was still sitting on the sofa when she awoke the next morning. Monica told detectives she spoke to Ricky the day before her interview and he |uinsisted he was with her the entire night of the crimes, while “looking at [her] all crazy.” She confirmed it seemed “Rieky was trying to get [her] to alibi him.” Monica generally cast aspersions on Ricky’s character, suggested Andy was afraid of him, and maintained, because she was asleep, she did not know if Ricky left Andy’s house on the night of the murders.
Monica was arrested on April 18, 2008. According to a written summary of her arrest, she told detectives “she wasn’t there.” According to the same summary, after being booked in jail, Monica asked to speak with detectives and, in the interview room with the detectives, “spontaniously (sic) stated that ‘alls I did was knock on the door, Ricky done it.’ ” According to the same statement, after being transported for another interview, she again stated “she wasn’t there.”
Two days later, on April 20, 2008, Monica again requested to speak with detectives and, in a transcribed interview, described hearing Ricky on the phone on the night of the murders telling someone he referred to as “baby”, he had a ride. Monica stated at approximately 1:30 or 2:00 a.m. on the night of the murders, after Andy locked himself in his room, Ricky left in Andy’s car and was gone for about an hour and a half. She described him as “acting weird” when he returned, “looking kind of crazy ,., like he had a lot on his mind.” She denied seeing Ricky with a gun, but said her brother-in-law told her “like a week before or a couple of days before” the murders Ricky called and asked to borrow a gun. She said she felt threatened by Ricky to provide him an alibi, saying he was with them the entire night of the murders. However, she felt Ricky had something do with the victims’ deaths because he left that night, was acting “weird,” and wanted her to say he was there all night. She also found it suspicious that in the days that followed she saw him constantly buying drugs, though he was not known to have money. She claimed she did not tell this to police in earlier interviews because she was scared of Ricky.
*47 lifiOn April 17, 2008, Carla Simmons told detectives she was released from jail on March 14, 2008, when Monica approached her and “told [her] about [the victims.]” According to Carla, Monica said she, Ricky Magee, and Andy James went to see De-mille, who had been “flashing” money. Monica said she knocked'on the door and was the only person Kim would have let into the house at night. Monica said Ricky entered the house first, then Andy entered. Monica said she did not enter the house, but heard two gun shots. Monica told her, “Ricky did the shooting[.] Kim wasn’t suppose to got shot.” Carla told detectives Monica told her the same thing approximately two weeks before the April 17, 2008 interview.
On September 17,2008, Elissa Smith, an inmate housed "in the dorm'with Monica Simmons, told detectives Monica said she was in jail for murder and “the police got got her wrong,” and one of the victims was Monica’s friend. Monica told Elissa that on the night of the murders, she, Ricky, and the victims had gone to a . club, then back to the victim’s house where they ate pigs feet. Monica said she was on heroin that night, and she and Ricky got some drugs from the drug dealer’s house. Monica.said she and Ricky went to someone else’s house to smoke the drugs. Monica said Ricky noticed the drug dealer, had a lot of money and said he was going to rob them. According to Elissa, “[Monica] was like well just bring me some ... dope,” then Monica clarified she wanted heroin, not crack. According to Elissa, Monica said she went to sleep, then Ricky woke her telling her to say he was with her if anyone asked. Monica said she did not know the victims had died.
Elissa said Monica kept saying she was in jail because she would not tell on “him,” and she asked if Monica thought “he did it.” Monica said she did not see him do it, but in her heart she knew he had done it, otherwise he would not ask her to lie. Monica, said she would not tell police what she knew because they were already “looking at him for killing two white people” and he had supposedly shot |1fisomeone else in the face in front of their pregnant “old lady.” Elissa suggested Monica was scared for. her life.
Elissa told the detectives Monica said Kimberly (Kim) was her best friend, and Ricky did return-with heroin that night. Elissa said Monica did not say Ricky-had a gun. but said “something about burning the house down ... she say he burnt the house down or something.” Elissa said Monica did not say much about the other man with them that night at the- house, indicating only “he. didn’t ... he didn’t have nothing to do with it.” Elissa told detectives Monica told her. all of this while crying, because she had not been released from-jail as she believed she would be. Elissa denied anyone solicited the information from her, stating “actually I brought it to my DA’s attention for a lighter sentence.”
The trial court found Monica’s statements did not constitute statements against interest because she did not admit criminal liability for the murders and had no idea she was there to commit criminal acts. Our standard of review requires deference to the trial court’s determination of the admissibility of evidence, such that the trial court’s ruling will not be disturbed absent a clear abuse of discretion. See State v. Stokes, 14-1562 (La. App. 1 Cir. 6/17/15), 175 So.3d 419, 423. “Admission of statements against interest, as a traditional exception to the hearsay rule, is based on necessity and trustworthiness.” State v. Hammons, 597 So.2d 990, 96 (La. 1992) (emphasis added). The essence of the hearsay exception for. statements against interest is that the substantial adverse im *48 pact of the statement on the declarant raises the reliability or trustworthiness of the statement to a level that warrants admitting the statement. The context and circumstances relative to the hearsay statements attributed to Monica do not demonstrate their trustworthiness and do not compel their admission into evidence, particularly in light of the inconsistencies as to whether Monica was at the victims’ residence when they were murdered.
117Further, the statements attributed to Monica are not excited utterances. See La. Code Ev. art. 803(2). An excited utterance is a statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition. La. Code Ev. art. 803(2), The two basic requirements for an excited utterance are (1) an occurrence or event sufficiently startling to render normal reflective thought processes of an observer inoperative, and (2) the statement of the declarant was a spontaneous reaction to the occurrence or event and not the result of reflective thought. State v. Hilton, 99-1239 (La.App. 1 Cir. 3/31/00), 764 So.2d 1027, 1034, writ denied, 00-0958 (La. 3/9/01), 786 So.2d 113. In considering the spontaneity of the reaction, the trial court must determine whether the time interval between the event and the statement was long enough to permit a subsidence of emotional upset and a restoration of a reflective thought process. Hilton, 764 So.2d at 1035.
The trial court did not abuse its discretion in rejecting the defendant’s argument that Monica’s statement made in response to her arrest was an excited utterance. The arrest was not sufficiently startling to render Monica’s normal reflective thought process inoperative. Before making any statements to the contrary, she was interviewed twice by detectives and both times denied being present at the time of the murders. In fact, the second denial was at the time of her arrest. After her arrest, and after being booked in jail, Monica requested to speak to detectives and, according to the written summary of an unknown person at the Washington Parish Sheriffs Office, “spontaneously” revealed she had been present at the murder scene. The proffered summary establishes that some time passed between Monica’s arrest and the statement, but how much time cannot be determined from this record. Furthermore, Monica’s statements to detectives at the time of her arrest nearly six weeks after the murders, to Carla weeks after the murders, and to Elissa months after the murders, were all made after the | ^opportunity for reflective thought and cannot be considered excited utterances. The trial court did not err in finding these statements were inadmissible hearsay.

Paul Robinson

By invoking his Fifth Amendment right not to testify, Paul Robinson was also an “unavailable” witness. See La. Code Ev. Art. 804; Coleman, 188 So.3d at 194. The defendant sought to introduce the transcript of Paul’s March 16, 2008 police interview in which he said Ricky Magee confessed to committing the murders.
In summary, Paul told detectives a few days after the murders, he was “getting high smoking crack and snorting heroin” with Ricky, and Ricky “came out the blue and just made the comment that ... he had to kill his friend,” Kim. Paul said Ricky did not say how he killed her, just he hated he had to kill her. Paul told the detectives Ricky did not say anything about Demille, “he was just on Kim because his conscious you could tell his conscious was was killing him. It was eating him alive about Kim.” Paul described Ricky’s demeanor as unusual because Ricky kept his head down, while he was usually “all in your face.”
*49 Paul also indicated that, as normal, Ricky had his gun with him, which appeared to be a .38 caliber revolver or a “smaller version of a 357,” and Ricky also had a Crown Royal sack full of twenty and one hundred dollar bills. Paul stated he believed Ricky was unemployed and did not normally have that much money. Paul related when he saw Ricky again days later, Ricky “was real nervous.” When detectives asked if he thought Ricky was suicidal, Paul said he did not hear that, but would not doubt it “cause he was real shook up about what he had did.”
Because Paul did not testify, his statement to police, which includes Ricky’s alleged statement to Paul, is double hearsay or hearsay within hearsay. Hearsay within hearsay is admissible only if each part of the combined statement conforms |1swith an exception to the hearsay rule. La. Code Ev. art. 805. The trial court correctly determined Paul’s statement to police was not a statement against interest because it only incriminated Paul for drug use, not for the victims’ murders. See State v. Boyer, 10-693 (La.App. 3 Cir. 2/2/11), 56 So.3d 1119, 1149, writ denied, 11-0769 (La. 1/20/12), 78 So.3d 138. Nor does that portion of the statement fall under any other exception to the hearsay rule. Also of note, the statement which Paul attributes to Ricky was made while Paul and Ricky were high on crack and heroin. As such, it lacks any indicia of trustworthiness.
The defendant additionally contends that Paul’s statement is admissible under the “then-existing mental, emotional, or physical condition” exception to the hearsay rule. See La. Code Ev. art. 803(3). This argument is misplaced. A statement of present state of mind cannot be used to prove the declarant’s past conduct. See State v. Magee, 11-0574 (La. 9/28/12), 103 So.3d 285, 317 n.34, cert. denied, — U.S. -, 134 S.Ct. 56, 187 L.Ed.2d 49 (2013). The statement which Paul attributes to Ricky was offered to prove Ricky’s alleged past acts. Paul’s statement to police was inadmissible hearsay and was correctly excluded from evidence.

Ricky Magee

Ricky Magee did not invoke his Fifth Amendment right, and was available to testify. The defendant has indicated Ricky was not called as a witness because Ricky was expected to testify consistent with his statement to police, where he denied committing the murders, and because the trial court ruled the statements the defense planned to use to impeach Ricky’s denials were inadmissible.
On March 18, 2008, detectives interviewed Ricky about his whereabouts on Friday March 7 through Saturday March 8. Ricky stated he went to Franklinton Friday afternoon and stopped by the victims’ house on his way home, purchased some crack cocaine and “accepted pigs feets.” Ricky clarified he called and spoke lanto Demille and Demille was expecting him to come by the house. He left the victims’ house, then went back there between 7:00 and 7:30 that night, then to a friend’s house, and then to Andy James’ house where he smoked crack and stayed until the next morning. Ricky stated that Andy woke him about 11:00 a.m. and told him what happened to the victims. He described stopping by the victims’ house “where the incident suppose to happen,” later on Saturday, then consuming alcohol and sitting at a pond for several hours talking on the phone. Ricky told the detectives he stayed at Andy’s house Saturday night, then went to church for the first time in a while, the timing of which he attributed to a lady bringing him appropriate clothes. On Monday following the mur *50 ders, Andy told him police were looking for him, and he went to speak with them.
Relative to the night of the murders, Ricky said it was not possible it was after 2:00 a.m. when he arrived at Andy’s house. He said Monica Simmons opened the door for him when he arrived. He then smoked a piece of crack and went to sleep in the living room alone. Ricky denied leaving Andy’s house and stated if anyone said he was not there during the night, they were lying. Following the victims’ deaths, Ricky explained he stayed to himself because there was talk about the families threatening his life “for some crime that [he] never committed.”
Ricky admitted he previously robbed Demille “for crack cocaine,” but indicated the incident happened years prior and “that never had nothing played no part of nothing.” Ricky denied owning a gun or having been seen with one. He also denied being a drug dealer or having a problem with drugs, explaining, “I just took a liking to doing the drugs.” When asked about his claim he smoked crack, a stimulant, then went to sleep, Ricky explained the drug affects people differently, and he could smoke crack cocaine and go to sleep.
Ricky denied committing the murders. He denied telling anyone anything about the murders, and stated he would not voluntarily present himself to police if fyhe had. He explained, “Any police you ever had on the force that know Ricky Magee know if Ricky committed a crime you gone have to do your job to go get Ricky. You gone get your dogs your gone go through the woods you gone do it all. Ok?” Ricky expressed he would like to get .hold of the people who committed the crime, explaining he loved Demille, who was his nephew, and Kim, who was like a sister.
Ricky was then arrested, at which time he accused the detectives of arresting him without basis on lies and accusations of people on the streets. He said he went through the same thing before and went to prison when “a few cats [threw his] name up.” Ricky maintained he did not kill the victims.
The defendant has not argued, nor have we found, any exception to the hearsay rule that would allow the introduction of the out-of-court statement by Ricky Ma-gee, an available witness.

Bobby Ray Dillon and Ms. Freddie Williams

The defendant additionally proffered transcripts of statements to police by Bobby Ray Dillon (which was attached to the transcript of Carla Simmons’ statement) and Ms. Freddie Williams. The record does not reflect whether these witnesses were available or unavailable to testify at trial.
Bobby Ray told police he went to De-mille’s house late Friday night or early Saturday morning to buy drugs. He said he went by Andy’s house between 4:00 or 5:00 in the morning, then described the individuals he saw or was told were there, which did not include Ricky Magee. However, the next day, Andy called Bobby Ray and told him that he did not realize that “some white snaggled tooth girl” had dropped off Ricky that morning, and Andy had not realized Ricky was there. Bobby Ray told detectives Ricky later stopped him in town trying to get. information. Later, ■ he saw Ricky, who seemed “like sorry behind what he done.” He said Ricky said he “ain’t did nothing.” Bobby Ray found Ricky’s behavior to |agbe out of character and described it to his parents and others. Bobby Ray denied seeing Ricky with a gun, but knew Demille had a “.380.” He told detectives he had not seen Ricky with a gun, but Ricky had access to “whatever he needs when he need it.”
*51 Ms. Williams is the grandmother of the victim, Demille Williams. She gave a statement to detectives and explained Andy James told Ricky Magee to leave- his house, and there was something Andy was not telling. She said she spoke to Ricky (to whom she was also related) on the telephone and asked what he was doing at the victims’ house. She said he told her he was there on the morning of the fire to buy drugs and he ate pigs feet with the'victims. She said she knew Ricky was lying because Demille normally would not let anyone in, and it would not be in Demille’s demeanor to invite Ricky in for pigs feet since Ricky previously robbed Demille. She further indicated Ricky and Kimberly were not friendly. Ms. Williams stated she did not know Monica Simmons, but learned Monica and Kimberly were Mends and believed “that’s the way [he] probably got in... that’s what everybody said.”
• The defendant offers no argument as to the admissibility of these hearsay statements, except that Ms. Williams’ statement that Ricky would not have been allowed in the victims’ home to eat could have been used to impeach Ricky’s statement to police. But, the defendant elected not to call Ricky as a witness, and Ricky’s statement to police was inadmissible. The defendant is riot entitled to present the jury with evidence impeaching an inadmissible statement. The statements were properly excluded.

Right to Present a Defense

The defendant argues that the exclusion of the evidence at issue resulted in a violation of his constitutional right to present a defense. Few rights are more fundamental than a defendant’s right to present a defense. Chambers v. Mississippi, 410 U.S. 284, 302, 93 S.Ct. 1038, 1049, 35 L.Ed.2d 297 (1973); State v. Clark, 12-0508 (La. 12/19/16), 220 So.3d 583 (2016 WL 7378687). In compelling circumstances, the defendant’s right to present' his defense allows admission of hearsay evidence. See State v. Rubin, 15-1753 (La. 11/6/15), 183 So.3d 490, 491 (per curiam), State v. Gremillion, 542 So.2d 1074, 1078 (La. 1989). However, constitutional guarantees do not assure the defendant the right to admit any type of evidence — only that which is deemed trustworthy and has probative value. State v. Governor, 331 So.2d 443, 449 (La. 1976); State v. Thompson, 15-1518, 2016 WL 1535160 (La. App. 1 Cir. 4/15/16).
In Chambers, the defendant sought to introduce hearsay testimony of three individuals to whom a third person had confessed to committing the crime. The Supreme Court found the testimony “bore persuasive assurances of trustworthiness and thus was well within the basic rationale of the exception for declarations against interest.”- Chambers, 93 S.Ct. at 1038. The Supreme Court found the hearsay statements were made under circumstances that provided “considerable assurance of their reliability.” Chambers, 93 S.Ct. at 1038. Thus, the exclusion of the evidence violated the'defendant’s right to present a defense. Chambers, 93 S.Ct. at 1038.
In Gremillion, the defendant was on trial for manslaughter and sought to introduce the deceased victim’s statement that he was unable to identify his attacker. The Louisiana Supreme Court determined the victim’s statement did not fit a hearsay exception, but should have been admitted due to its reliability and trustworthy nature, noting the defendant and victim were close Mends who knew each other for years. Gremillion, 542 So.2d at 1078.
Our detailed review of the excluded statements reveals, not only are they, (or contain)'hearsay, but also, in contrast to *52 the statements addressed in Chambers and Gremillion, they are contradictory. More importantly, the primary criterion for ^admissibility — the trustworthiness and reliability of the statements — was not established. The trial court correctly excluded the statements.
WITNESS’S REFUSAL TO TESTIFY
The defendant next argues the trial court erred in allowing the state to call Townsend as a witness when the trial court, the prosecutor, and defense counsel were aware he was going to invoke the Fifth Amendment privilege.
The defendant’s argument mischaracter-izes the record. On the third day of trial testimony, before the state called Townsend to testify, Townsend’s attorney informed the court that Townsend, if called, would refuse to testify. The defense argued it would be prejudicial if Townsend refused to testify in the presence of the jury. The state argued Townsend already pled guilty and had no Fifth Amendment privilege. The trial court then informed Townsend, outside of the presence of the jury, he would be called to testify, he did not have a Fifth Amendment privilege, and he would be subject to contempt if he refused to testify, further reminding Townsend of his plea agreement. The defense objected to the ruling and re-urged its objection after Townsend said he did not want to testify. The trial court again overruled the objection.
When the jury returned, the state called Townsend to testify. Townsend refused to be sworn, and the trial court .asked Townsend if he desired not to testify and he stated, “Yes, sir.” The trial court held Townsend in contempt of court and allowed him to step out of the courtroom to confer with his attorney. When Townsend returned, he was sworn but stated he was refusing to testify. During a bench conference, the defense objected based on the constitutional right of confrontation. The trial court noted the defense was not denied its right of confrontation any more than the state was denied the right to have its witness.
Thereafter, Townsend refused to respond to the state’s questions, despite the trial court’s instruction to answer. The trial court then attempted to limit the | ar,state’s questioning of Townsend in front of the jury to whether Townsend had pled guilty, which the defense agreed was a matter of public record, and whether Townsend agreed to testify truthfully, a question which the defense objected to on grounds it would implicate the defendant. Because Townsend refused to answer the allowed questions, the trial court informed him he was still subject to contempt powers, and the state asked that Townsend remain in Washington Parish to be arraigned that afternoon on a multiple offender bill. Although the defense renewed its objection to Townsend taking the stand again, the trial court allowed the question whether Townsend pled guilty, to which he responded, “I refuse to testify.”
At the time of the defendant’s trial, Townsend had pled guilty and, despite the defendant’s claim otherwise on appeal, there was no indication Townsend’s testimony would subject him to further criminal liability arising out of this incident. According to the state, Townsend was obligated to testify by his plea agreement. The state was not informed until during the trial that Townsend would refuse to comply with the agreement. The trial court placed Townsend on the stand and attempted to compel him to testify, but Townsend refused to comply.
The trial court’s ruling that Townsend must testify was not erroneous. We further find no error in the trial court allow *53 ing the state to call Townsend as a witness under these circumstances.
MOTION FOR NEW TRIAL
Finally, the defendant contends the trial court erred in denying his motion for new trial, arguing that on the date of the hearing on the motion the state revealed it failed to provide the defense with the criminal record of Cindy Brewer. Cindy Brewer, Felicia Brewer’s mother, testified she had no knowledge of the murders, but during the course of the investigation had told an investigator from defense counsel’s office that her daughter and the defendant were drinking with Usher in Baton Rouge on the night of the murders. At trial she testified her statements about being in Baton Rouge that night were lies she told at the request of her daughter and the defendant. She said she did not remember where she was the night of the crimes; however, she was certain she had not been to Baton Rouge since the early 1990s. The defendant contends the non-disclosure by the state prevented Brewer’s impeachment and defense counsel’s failure to discover the evidence was not attributable to any lack of diligence.
To obtain a new trial based on newly discovered evidence, the defendant must show (1) the new evidence was discovered after trial, (2) the failure to discover the evidence at the time of trial was not caused by lack of diligence, (3) the evidence is material to the issues at trial, and (4) the evidence is of such a nature it would probably have produced a different verdict. State v. Tucker, 13-1631 (La. 9/1/15), 181 So.3d 590, 626, cert. denied, — U.S. -, 136 S.Ct. 1801, 195 L.Ed.2d 774 (2016); see also La. Code Crim. Pro. art. 851. In evaluating whether newly discovered evidence warrants a new trial, the test is not simply whether another jury might bring in a different verdict, but whether the new evidence is so material it ought to produce a different verdict. Newly discovered evidence affecting only a witness’s credibility is merely cumulative or impeaching and ordinarily will not support a motion for new trial. State v. Ayo, 14-1933 (La. 6/30/15), 167 So.3d 608, 613; State v. Cavalier, 96-3052 (La. 10/31/97), 701 So.2d 949, 951-52 (per curiam). Nevertheless, the trial court has discretion to grant a new trial when testimony of a witness is essentially uncorroborated and dispositive of the question of guilt or innocence, and it appears that if the impeaching evidence was introduced, the jury would likely have reached a different result. Ayo, 167 So.3d at 613. In making this determination, the trial court may assume the jury would have known the witness had lied about the matter. Cavalier, 701 So.2d at 951-52.
127The defendant argues the instant case is factually similar to State v. Maise, 14-1912 (La. 6/30/15), 172 So.3d 639 {per cu-riam ), where the supreme court held newly discovered evidence undermining the credibility of two witnesses, including the alleged victim, warranted a new trial. The defendant argues he has made the showing that Brewer’s testimony is essentially uncorroborated and dispositive of the question of guilt or innocence, and it is likely the jury would have reached a different result if the impeaching evidence was introduced. The defendant concludes in light of “the unique facts of this case” justice will only be served if a new trial is granted and a new jury hears all of the evidence.
We find no merit to the defendant’s argument. The newly discovered evidence cited by the defendant was not likely to produce a different verdict. The trial court did not abuse its discretion in denying the defendant’s motion for new trial. See State v. Ruffin, 16-0264 (La.App. 1 Cir. 9/20/16), — So.3d-,-(2016 WL 5110128).
*54 CONVICTIONS AND SENTENCES AFFIRMED.
Holdridge J. concurs w/ reasons assigned.
Welch dissents and assigns reasoñs.

. Brewer testified that Townsend told her the clothing was burned; however the trial court ordered the juty to disregard that hearsay statement.

. Outside the presence of the jury, the trial court stated it was made aware the defense intended to call several witnesses who may invoke their Fifth Amendment rights against self-incrimination. A public defender counseled each witness, then represented to the court whether each witness intended to exercise his or her right against self-incrimination or would testify. No objections were entered.