Higginbotham, J.
The defendant, Carlos Lampley, was charged by an amended grand jury indictment on count one with trafficking of children for sexual purposes, a violation of La. R.S. 14:46.3, and on counts two, three, and four with human trafficking, violations of La. R.S. 14:46.2.[1] The defendant pled not guilty on all counts, and proceeded to trial by jury. Prior to the verdict, the trial court granted the defendant's motion to quash as to count four. The jury found the defendant guilty as charged on counts one and two, and guilty of the responsive offense of attempted human trafficking on count three, in violation of La. R.S. 14:27 and La. R.S. 14:46.2.[2]
*803 The defendant was sentenced on count one to fifteen years imprisonment at hard labor without the benefit of parole, probation, or suspension of sentence; on count two to twenty years imprisonment at hard labor without the benefit of parole, probation, or suspension of sentence; and on count three to five years imprisonment at hard labor without the benefit of parole, probation, or suspension of sentence. The trial court ordered that all three sentences be served consecutively. The trial court denied the defendant's motion to reconsider sentence. The defendant now appeals, assigning error in a counseled brief to the sufficiency of the evidence and the constitutionality of the sentences, and assigning error in a pro se brief to the State introducing other crimes evidence without a hearing pursuant to State v. Prieur, 277 So.2d 126 (La. 1973), the State failing to disclose evidence in violation of Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), and the State misrepresenting its burden of proof during voir dire.
STATEMENT OF FACTS
On June 21, 2012, the FBI, the Louisiana State Police, the East Baton Rouge Sheriff's Office, and the Baton Rouge Police Department (BRPD) conducted a multi-agency operation targeting prostitution and human trafficking in Baton Rouge, organized by FBI Special Agent Taneka Blacknell.[3] As a result of the operation, the defendant was arrested on that date. The operation took place at the Crestwood Suites Hotels in Baton Rouge, and targets were developed from the website Backpage as well as other websites. Further, under their procedure, an undercover agent was used to contact suspected prostitutes to arrange a date and, after an agreement for sex was negotiated, the police would enter the hotel room and make an arrest.
On the date noted above, June 21, 2012, an undercover agent negotiated a sex act with a sixteen-year-old high school student, then the agent gave an audible signal for the officers to enter the room. While at the hotel, the officers made contact with the defendant who was at the hotel with another female. The officers detained, separated, and questioned the defendant and the female. The officer conducted a search of the defendant and discovered he had a hotel key for Room 326.[4] The defendant gave the officers consent to search the hotel room, and in doing so, they discovered a bag of alprazolam pills. Once the defendant was confronted regarding the pills, he denied that Room 326 was his room, indicating that Room 240 was his room. The officers then went to Room 240, where they located two other females, a substantial amount of paperwork[5] bearing the defendant's name, and a DVD. The room was not registered in the defendant's name, and he did not have a key to the room on his person. The defendant was placed under arrest for possession of drugs, solicitation for prostitution, and human trafficking.
*804 M.P., the victim on count one (trafficking of children for sexual purposes), testified that her date of birth is January 14, 1994.[6] According to the indictment, the offense was committed "[o]n or about July 2011 to October 19, 2011[.]" M.P. first met the defendant at a studio in Baton Rouge. Although she was seventeen years old at the time, she told the defendant she was eighteen years old. After the initial meeting with the defendant, she became interested in the life that he described to her, and began participating in "dates." Her first date was obtained as a result of a "backpage" ad that one of the girls posted on her behalf. M.P. specifically described the date as her going to a room with the "trick" and having sex with him. She received payment in exchange for the sex and was told to go pay her "Daddy," the defendant. She went on more dates and eventually began working the "track," which consisted of her riding around to pick someone, preferably a New Orleans tourist, and attempting to obtain their personal information, including pin numbers. In addition to stealing pin numbers, on some occasions she performed sexual acts while working the track. Whenever she would obtain money, she would give it to the defendant. When she obtained credit cards and pin numbers, she would go to an ATM to check the balance on the card, retrieve funds, and then go to Walmart to purchase money orders to give to the defendant.
M.J., the victim on count two (human trafficking when the services include commercial sexual activity), confirmed that her date of birth is August 26, 1987. She further testified that she was a prostitute for the defendant. According to the indictment, the offense was committed "[o]n or about January 2008 [.]" M.J. first met the defendant in 2007, through a female who indicated that she needed help getting away from a male who she was staying with at the time. After prostituting for another pimp who would beat her, M.J. began working for the defendant instead. All of the money that she obtained from "tricks" was given to the defendant. M.J. considered herself as one of the defendant's higher earners. She testified that $90,000 was the most amount of money she ever made for the defendant in one night. She confirmed that if she ever failed to do something that she was supposed to do, the defendant would punish her by hitting her, withholding food, or raping her.
K.W., the victim on count three (attempted human trafficking when the services include commercial sexual activity), testified that her date of birth is July 30, 1996.[7] According to the indictment, the offense was committed "[o]n or about June 21, 2012[.]" At trial, K.W. denied that she was ever solicited by the defendant to work as a prostitute, but stated that she and D.J., her close childhood friend that she referred to as "her sister," met the defendant at a hotel. K.W. recalled giving a pretrial interview to FBI Agent Blacknell, but did not recall the content of the interview. According to Agent Blacknell, during her pretrial interview of K.W. on August 2, 2012, K.W. confirmed that she and D.J. met the defendant at a hotel, and he described the concepts of pimping and *805 prostitution and proposed that she participate in such acts, but she refused.
SUFFICIENCY OF THE EVIDENCE
In counseled assignment of error number one, the defendant argues that because no rational juror should have found the State proved the case beyond a reasonable doubt, the convictions should be reversed. As to count one, the defendant contends that there are several things that cast doubt on the credibility of M.P., the victim on count one. First, he notes that M.P. lied about her age, a factor in the offense charged and the sentencing. Second, he contends that while incarcerated, M.P. wrote a letter to M.J., the victim on count two, stating that their stories needed to be consistent and encouraged M.J. to relay a fabricated story. The defendant further argues that the likelihood of M.P. being willing to lie to get out of trouble was further made evident by the fact that Agent Blacknell assisted her in having her criminal charges in New Orleans dismissed. Finally, the defendant asserts that M.P. was further motivated to lie because she did not have a relationship with the defendant, despite being admittedly in love with him.
As to count two, the defendant argues that M.J.'s story lacked credibility. He contends that despite the fact that she worked as a stripper in a strip club and had a "sugar daddy," she testified that she had no idea that pimps existed. In claiming that M.J.'s testimony was inconsistent with the "essence and purpose of a sugar daddy," the defendant contends that M.J. testified that her so-called "sugar daddy" did not pay her rent and that she could not recall how he helped her get an apartment. Further, the defendant notes that M.J. testified that she was not allowed to visit her mother in Baton Rouge, though she was allowed to travel to at least twelve cities across the United States. He claims that M.J. worked with M.P. in developing a plan to concoct a story and that M.J., like M.P., would say whatever was necessary to minimize her own culpability. Finally, the defendant notes that Agent Blacknell helped M.J. with traffic tickets, which he argues could be seen as a reward for cooperating with the government.
As to count three, the defendant argues that while he was found guilty of attempted human trafficking, the testimony of the victim K. W. did not establish any of the elements of human trafficking. The defendant notes that K.W. stated that he never solicited her for prostitution, that she did not recall him asking to be her pimp, and that she never saw the defendant ask her friend D.J. to serve as her pimp. He notes that Agent Blacknell's prior interview of K. W. was not recorded, and contends that the agent's interpretation of the interview was not reliable because it was possible that K.W. did not understand certain aspects of the questioning. In that regard, he notes that K.W. indicated at trial that she was unsure of the meaning of solicitation. He further contends that Agent Blacknell may have misinterpreted or skewed her answers.
In addition to arguing that the credibility of the victims is at issue, the defendant argues that there was no evidence to corroborate the crimes. He specifically contends that there was nothing linking him to any stolen credit cards, and nothing to prove that he received any money from the victims or was benefiting from the work they claimed they were doing. Finally, the defendant claims that he had a legitimate reason for being around prostitutes. In that regard, he notes that he filed proper paperwork to form several limited liability companies to create movies and write a book.
*806 A conviction based on insufficient evidence cannot stand as it violates Due Process. See U.S. Const. amend. XIV ; La. Const. art. I, § 2. The constitutional standard for testing the sufficiency of the evidence, as enunciated in Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979), requires that a conviction be based on proof sufficient for any rational trier of fact, viewing the evidence in the light most favorable to the prosecution, to find the essential elements of the crime beyond a reasonable doubt. See La. Code Crim. P. art. 821(B) ; State v. Ordodi, 2006-0207 (La. 11/29/06), 946 So.2d 654, 660. In conducting this review, we also must be expressly mindful of Louisiana's circumstantial evidence test, which states in part, "assuming every fact to be proved that the evidence tends to prove," every reasonable hypothesis of innocence is excluded. See La. R.S. 15:438 ; State v. Wright, 98-0601 (La. App. 1st Cir. 2/19/99), 730 So.2d 485, 486, writs denied, 99-0802 (La. 10/29/99), 748 So.2d 1157 &, 2000-0895 (La. 11/17/00), 773 So.2d 732.
In the absence of internal contradiction or irreconcilable conflict with the physical evidence, one witness's testimony, if believed by the trier of fact, is sufficient to support a factual conclusion. State v. Higgins, 2003-1980 (La. 4/1/05), 898 So.2d 1219, 1226, cert. denied, 546 U.S. 883, 126 S.Ct. 182, 163 L.Ed.2d 187 (2005). Further, the testimony of the victim alone is sufficient to prove the elements of the offense. State v. Dickerson, 2016-1336 (La. App. 1st Cir. 4/12/17), 218 So.3d 633, 640, writ denied, 2017-1147 (La. 8/31/18), 251 So.3d 1062. The trier of fact is free to accept or reject, in whole or in part, the testimony of any witness. State v. Richardson, 459 So.2d 31, 38 (La. App. 1st Cir. 1984). The trier of fact's determination of the weight to be given evidence is not subject to appellate review. An appellate court will not reweigh the evidence to overturn a fact finder's determination of guilt. State v. Taylor, 97-2261 (La. App. 1st Cir. 9/25/98), 721 So.2d 929, 932. An appellate court errs by substituting its appreciation of the evidence and credibility of witnesses for that of the fact finder and thereby overturning a verdict on the basis of an exculpatory hypothesis of innocence presented to, and rationally rejected by, the jury. State v. Calloway, 2007-2306 (La. 1/21/09), 1 So.3d 417, 418 (per curiam). A court of appeal impinges on a fact finder's discretion beyond the extent necessary to guarantee the fundamental protection of due process of law in accepting a hypothesis of innocence that was not unreasonably rejected by the fact finder. See State v. Mire, 2014-2295 (La. 1/27/16), --- So.3d ----, ----, 2016 WL 314814 (per curiam ).
Regarding count one, pursuant to La. R.S. 14:46.3(A)(1) (as in effect at the time of the offense), trafficking children for sexual purposes is committed when a person knowingly recruits, harbors, transports, provides, sells, purchases, or otherwise obtains a person under the age of eighteen years for the purpose of engaging in commercial sexual activity.[8] Further, it is unlawful for any person to knowingly benefit from activity prohibited by the statute. See La. R.S. 14:46.3(A)(2). "Commercial sexual activity" means any sexual act performed or conducted when anything of value has been given, promised, or received by any person. La. R.S. 14:46.3(B). Consent of the minor shall not be a defense to a prosecution of trafficking children for sexual purposes.
*807 La. R.S. 14:46.3(C)(1). Further, lack of knowledge of the victim's age shall not be a defense to a prosecution of trafficking children for sexual purposes. La. R.S. 14:46.3(C)(2).
Regarding count two, pursuant to La. R.S. 14:46.2(A)(1) (in effect at the time of the offense), human trafficking is committed when a person intentionally recruits, harbors, transports, provides, solicits, or obtains another person through fraud, force, or coercion to provide services or labor. "Fraud, force, or coercion" means, in pertinent part, causing or threatening to cause serious bodily injury or physically restraining or threatening to physically restrain another person. La. R.S. 14:46.2(C)(2). Pertinent to the instant offense, the State was further required to prove that the human trafficking was committed when the services included commercial sexual activity or any sexual conduct constituting a crime under the laws of this state. La. R.S. 14:46.2(B)(2) ; La. R.S. 14:46.2(C)(1).
On count three, the defendant was convicted of the responsive offense of attempted human trafficking when the services include commercial sexual activity.[9] Under La. R.S. 14:27(A), a person is guilty of an attempt to commit an offense when he has a specific intent to commit a crime and "does or omits an act for the purpose of and tending directly toward the accomplishing of his object." Specific criminal intent is that state of mind which exists when the circumstances indicate that the offender actively desired the prescribed criminal consequences to follow his act or failure to act. La. R.S. 14:10(1). Specific intent may be inferred from the circumstances. State v. Holliday, 623 So.2d 127, 129 (La. App. 1st Cir.), writ denied, 629 So.2d 358 (La. 1993).
Herein, the DVDs in evidence are labeled with handwritten titles that include such language as "Pimpin Quick" and "Da Emperor King Carlos Pimpin Short Vedio's [sic]." Featured footage includes a tour of a furnished two-story house that was promised to the victims and dialogue referencing terms such as, "send a bitch," "track," and "lacing a bitch." Agent Blacknell, who was familiar with the terminology based on her experience with investigations and seminars, explained that females are routinely sent to make money through prostitution and/or stealing credit cards, ATM cards, and extracting funds. The term "track" references any place where a female can make money from picking up customers on the streets. As Agent Blacknell further explained, "lacing a bitch" meant to dress her up with nice clothing and grooming, and to "[t]each her the game." The video also discussed "rules" of pimping. The rule that everything must be taken away from victims means that they are deprived of their identity and anything that they might desire or enjoy. For example, the pimp will not reference them by their real names and will instead give them an assigned name and take away anything that might cause them to give less attention to the pimp. Further, the victims are not allowed to ask the pimp questions or to ask for anything, they are only to receive what the pimp decides to provide for them.
Agent Blacknell testified that M.P., the victim on count one, was seventeen years old and working for the defendant at the time of her recovery by law enforcement.
*808 M.J., the victim on count two, came to know the defendant when she was nineteen years old, was featured in one of the videos, and worked for the defendant intermittently for several years. Agent Blacknell further testified that K.W., the victim on count three, was a fifteen-year-old juvenile who the defendant tried to lace and entice into the prostitution game, but she refused. K.W. and her friend, D.J., were simultaneously recovered by law enforcement. Agent Blacknell interviewed each of the females.[10] Agent Blacknell confirmed that M.P. had criminal charges in New Orleans and that she received a request to provide testimony on behalf of M.P. regarding those charges. She further testified that she assisted M.J. in determining the outstanding fines and charges that she had on traffic offenses, noting that M.J. subsequently paid some of the fines on her own volition. Agent Blacknell denied that M.P., M.J., or K.W. received any monetary assistance.
M.P. testified that when she initially met the defendant, he told her that he had ten other girls who looked just like her, and she exchanged telephone numbers with him. The defendant later called her and asked her to smoke with him and "hangout." At the arranged meeting, they smoked and watched a DVD that featured footage that "looked like MTV Cribs." The defendant began telling her how they could make a lot of money, and indicated that she could get a bank account, car, and an apartment. M.P. became interested as he further told her about "dates." She initially did not fully understand what that term meant, as the defendant continued talking to her about pimping and "prepping" her, including instructions to not look directly at the males and to instead keep her head down. She confirmed that she was with her friend D.F. when she went to see the defendant. M.P. specifically described their actions in obtaining pin numbers from males who they met while on the "track" as follows,
We mainly went to this one store where we would ask them to put gas in the car and that's when one girl would be on the outside with the trick trying to get the pin number and the other [girl] would be on the inside of the car in case one missed a number the other one could have caught it.
When asked if she ever kept any of the money that she obtained, M.P. repeatedly denied it, stating, "It wasn't my money to keep...It was for Carlos." She explained that she was brainwashed, programmed, and taught to give the money to the defendant and therefore did so each time. She denied ever having a relationship with the defendant, but confirmed that he had been physical with her, specifically recalling an occasion that he slapped her when she called him a stupid pimp. She further witnessed the defendant being violent with other females. M.P. admitted to writing a letter to M.J. in preparation for their statements to law enforcement, stating that she wrote the letter because she was loyal to the defendant. M.P.'s friend, D.F., who met the defendant with M.P., testified *809 at trial and confirmed that when they met the defendant, M.P. was seventeen years old.
M.J. testified that when she first met the defendant, he told her that he was a pimp and she did not initially believe him. She noted that she did not know that pimps really existed, as she was not raised around those sort of people. She confirmed that she was a stripper at one point, but indicated that she never met a pimp before meeting the defendant. M.J. further testified that a "love triangle" formed between her, the defendant, and the female who introduced her to the defendant. The defendant initially told her that she would never have to prostitute. She ultimately met a different pimp who "made" her work on the track. This particular pimp, whom she considered a "gorilla pimp" (a term used for an excessively physically abusive pimp), began beating her. She further observed him beat another female, and she was afraid of him. On one occasion she went to pick up another female, and she saw the defendant. As to that incident, she testified,
He, Mr. Lampley, came and blocked me in and he started telling me things, basically like, I know I love him and I know I want to be with him, and I was scared of the other pimp. ... [H]e told me the only way to get away from [the other pimp] was to choose up with himself, Mr. Lampley.
At that point, M.J. began working for the defendant. The defendant instructed M.J., along with other females, to work in New Orleans by soliciting tourists on the track. M.J. confirmed that she committed acts such as theft (stealing debit cards from "tricks") and further confirmed that she gave all of the money that she obtained to the defendant. She denied keeping any of the money. She confirmed that she acquired a credit card in her name, but only the defendant was allowed to use it. She stated that she did not want to continue to work for the defendant, but she felt trapped.
K.W. confirmed that she met the defendant in a hotel room along with D.J. K.W. further stated that she was a runaway at the time, and that she did not recall the content of the conversation that she had with the defendant. When asked to review Agent Blacknell's interview report, K.W. specifically testified that she was not denying that she made the statements reflected in the report, but testified that she did not recall what she stated during the interview. When asked if it was possible that she told the agent that the defendant solicited her for prostitution, she asked the prosecutor to define the word solicited. She interrupted the prosecutor as he began to provide a definition. She denied that she would have had a reason to lie to a federal agent.
When recalled to the stand, Agent Blacknell testified that during her interview of K.W., she indicated that she and D.J., K.W.'s friend, met the defendant at a hotel, he told her that he was a pimp, that he had a room in the hotel, and that they could come to one of his rooms to relax. He later showed them a video about pimping and started introducing them to the topic of prostitution. K.W. informed Agent Blacknell that she refused the defendant's proposal, stating that it did not make sense to her to sell her body for money and give the money to a pimp.
Agent Blacknell confirmed that through the course of her investigation, she obtained information indicating that the defendant had formed limited liability companies with the State of Louisiana, including one called "4 Da Record LLC," and one called "Strait Lace No Chase LLC." She further recovered information about possible books that the defendant was attempting *810 to author, specifically confirming that she recalled seeing chapters from a purported book. She confirmed seeing one document entitled, "A Pimp's Confession" and another entitled "E Pluribus Unum."
The defendant's hypothesis of innocence that he was conducting business as a part of legal companies, creating a reality television show, and/or writing a book was reasonably rejected by the jury. Regardless of whether the defendant was aware of her age or not, M.P. was under eighteen at the time of the offense on count one. Victims M.P. and M.J. detailed incidents involving the defendant obtaining their services for the purpose of engaging in sexual acts performed for money. Further, the victims were forced to give the money to the defendant. M.J. specifically testified that she feared the defendant, and that he would hit, starve, or rape her for failure to abide by his rules. She said she was coerced into working for the defendant to get away from another pimp. As to victim K.W., the jury apparently accepted Agent Blacknell's testimony regarding K.W.'s description of the defendant's pitch to join his prostitution organization. Accordingly, the record amply supports an inference by the jury that the defendant had the specific intent to recruit, solicit, or obtain the use of K.W. through fraud, force, or coercion to provide services engaging in commercial sexual activity, and that he completed an act in furtherance of that goal.
In reviewing the evidence, we cannot say that the jury's determination was irrational under the facts and circumstances presented to them. See Ordodi, 946 So.2d at 662. Based on our careful review of the record, we are convinced that any rational trier of fact, viewing the evidence presented at trial in the light most favorable to the State, could have found beyond a reasonable doubt, and to the exclusion of every reasonable hypothesis of innocence, that the defendant was guilty of the offenses of trafficking of children for sexual purposes, human trafficking when the services include commercial sexual activity, and attempted human trafficking when the services include commercial activity. Accordingly, counseled assignment of error number one lacks merit.
EXCESSIVE SENTENCE
In the second counseled assignment of error, the defendant argues that the sentences imposed in this case, while within the sentencing range, are excessive when imposed consecutively. He argues that the trial court judge had an emotional reaction to the case, noting that she compared the defendant to a slave master and stated that both she and the defendant carried in their DNA the rapes of their African American ancestors by persons of European descent. He further notes that the trial court judge, at one point, noted that one of her ancestors ran a brothel during Jim Crow in Baton Rouge. The defendant argues that the trial court judge's consideration of personal feelings and emotions was improper and prejudicial. He also claims that the trial court judge considered statements that he made in his videos although the references were not proven to be actions that he actually employed, as opposed to actions he only spoke about. He argues that the trial court judge did not justify the imposition of consecutive sentences in this case, contending that the counts were part of a common plan or scheme.
In accordance with La. Code Crim. P. art. 920(2), all appeals are reviewed for errors patent on the face of the record. After reviewing the record, we note the following: the trial court imposed the defendant's sentences without the benefit of parole on each count, and the penalty provisions of the statutes under which the *811 defendant was convicted do not authorize such a restriction on parole eligibility. See La. R.S. 14:46.3(D)(l)(a) ; La. R.S. 14:46.2(B)(2) ; La. R.S. 14:27(D)(3). Thus, the inclusion of the parole restriction rendered the sentences illegal. In State v. Williams, 2000-1725 (La. 11/28/01), 800 So.2d 790, 802, the Louisiana Supreme Court recognized that this court has the authority to correct an illegal sentence despite the failure of either party to raise the issue in the district court or on appeal if the correction is ministerial. La. Code Crim. P. art. 882(A).
Herein, the sentencing errors noted involve discretion in regard to the length of the term of imprisonment and/or the imposition of a fine. As the Supreme Court has previously admonished, "[t]o the extent that the amendment of defendant's sentence entails more than a ministerial correction of a sentencing error, the decision in State v. Williams, 00-1725 (La. 11/28/01), 800 So.2d 790, does not sanction the sua sponte correction made by the court of appeal on defendant's appeal of his conviction and sentence." State v. Haynes, 2004-1893 (La. 12/10/04), 889 So.2d 224. Thus, we must vacate the sentences and remand for resentencing.[11] Therefore, we pretermit consideration of the excessive sentence arguments in the second counseled assignment of error.
LACK OF A PRIEUR HEARING
In the first pro se assignment of error, the defendant claims that the trial court erred in allowing the State to introduce other crimes evidence without first conducting a Prieur hearing. The defendant notes that the State, prior to trial, filed notice to introduce evidence of other crimes, wrongs, or acts under La. Code of Evid. art. 404(B) and requested a Prieur hearing. The defendant further notes that his attorney filed an objection to the State's notice, which was based on the lack of specificity of the State's notice. The defendant further notes that when other crimes evidence is offered, the evidence must have substantial independent relevance and tend to prove a material fact at issue or rebut a defense. He reiterates that other crimes evidence was introduced at trial in this case without a hearing.
At the outset, we note that the defendant has not specified which evidence admitted at trial required a pretrial hearing or provided any record reference to any portion of the trial in support of his vague argument. Pursuant to Uniform Rules-Courts of Appeal, Rule 2-12.4(A), in pertinent part, the brief of the appellant shall contain an argument, which shall include appellant's contentions, with references to the specific page numbers of the record and citations to authorities on which the appellant relies. The court may disregard the argument on an assignment of error or issue for review if suitable reference to the specific page numbers of the record is not made. Uniform Rules-Louisiana Courts of Appeal, Rule 2-12.4(B)(3). Herein, the defendant's pro se brief on this issue simply contains generalized statements of law without any reference to any specific evidence presented at trial. We note that not every Prieur violation *812 mandates reversal. Before a defendant can complain of a Prieur violation, he must first show prejudice. State v. Sanders, 93-0001 (La. 11/30/94), 648 So.2d 1272, 1284, cert. denied, 517 U.S. 1246, 116 S.Ct. 2504, 135 L.Ed.2d 194 (1996). In State v. Lee, 25,917, (La. App. 2d Cir. 5/4/94), 637 So.2d 656, 662, writ denied, 94-1451 (La. 10/7/94), 644 So.2d 631, the second circuit explained that "[t]he rules of Prieur were not meant to be used as additional, technical procedures sacramental to a valid conviction" (quoting State v. Banks, 307 So.2d 594, 597 (La. 1975) ) and noted that substantial compliance with Prieur is all that is required.
In the present case, the defendant has made no attempt to show prejudice. Despite the defendant's inference otherwise, a pretrial hearing is not required by the mandates of Prieur .See State v. Davis, 2005-543 (La. App. 3d Cir. 12/30/05), 918 So.2d 1186, 1197, writ denied, 2006-0587 (La. 10/13/06), 939 So.2d 372. Further, while La. Code Evid. art. 1104 governs the burden of proof in a pretrial hearing held in accordance with Prieur , the article does not mandate such a hearing. Accordingly, pro se assignment of error number one lacks merit.
ALLEGED BRADY VIOLATION
In pro se assignment of error number two, the defendant argues that his constitutional rights were violated when the State failed or otherwise refused to disclose "specific types of evidence." He contends that the State's failure to disclose evidence resulted in the defense counsel filing a Brady[12] motion. After citing the law as to the constitution of a Brady violation, the defendant asserts that "said alleged evidence" introduced by the State was admitted at trial by the trial court. The defendant does not provide any specification as to what evidence was withheld by the State.
At the outset, we note that the defendant has not provided any indication of the evidence at issue in the assignment of error. As stated above in regard to the first pro se assignment of error, pursuant to Uniform Rules-Courts of Appeal, Rule 2-12.4(A), in pertinent part, the brief of the appellant shall set forth an argument giving specific page numbers of the record and citations to authorities. As further stated, this court may disregard the argument on an assignment of error or issue for review if suitable reference to the specific page numbers of the record is not made. Uniform Rules-Louisiana Courts of Appeal, Rule 2-12.4(B)(3). While the defendant notes in his second pro se assignment of error that his attorney filed a motion requesting Brady information, on appeal the defendant does not indicate which, if any, parts of the motion were not satisfied or how he was prejudiced by any particular failure to disclose.
In order to prove a Brady violation, the defendant must establish, inter alia , that the evidence in question was, in fact, exculpatory or impeaching. State v. Garrick, 2003-0137 (La. 4/14/04), 870 So.2d 990, 993 (per curiam). Late disclosure of favorable evidence may require reversal if the timing significantly impacted the defendant's opportunity to effectively present the material. State v. Kemp, 2000-2228, (La. 10/15/02), 828 So.2d 540, 545-46. However, Brady and the decisions that follow do not establish a general rule of discoverability and the State's failure to disclose or late disclosure does not automatically mandate a reversal. Rather, the defendant must first show he suffered prejudice as a result. La. Code Crim. P. art. 921 ;
*813 State v. Coleman, 2014-0402 (La. 2/26/16), 188 So.3d 174, 203, cert. denied, --- U.S. ----, 137 S.Ct. 153, 196 L.Ed.2d 116 (2016) ; see also United States v. Agurs, 427 U.S. 97, 112, 96 S.Ct. 2392, 2400, 49 L.Ed.2d 342 (1976) ; State v. Willie, 410 So.2d 1019, 1030 (La. 1982). In this case, the defendant has made no assertion on appeal as to how he suffered any prejudice regarding any Brady violation. Thus, pro se assignment of error number two lacks merit.
VOIR DIRE
In the final pro se assignment of error, referencing a record page number for a portion of the voir dire, the defendant argues that the State was allowed to explain to the prospective jurors that only one element was needed to be proven to convict the defendant. The defendant notes that under the due process clause, the State is required to prove beyond a reasonable doubt every element of a crime charged. He further notes that the State's failure to meet its burden of proof results in the defendant's acquittal. Finally, the defendant notes that subsequent to the State's voir dire remarks, the trial court otherwise instructed the sworn jurors during opening instructions that the State had to prove every element beyond a reasonable doubt.
We note that there was no objection by the defendant to the referenced statements at issue. Under La. Code Crim. P. art. 841, a contemporaneous objection is required to preserve an error for appellate review. The purpose of the contemporaneous objection rule is to allow the trial judge the opportunity to rule on the objection and thereby prevent or cure an error. State v. Hilton, 99-1239 (La. App. 1st Cir. 3/31/00), 764 So.2d 1027, 1035, writ denied, 2000-0958 (La. 3/9/01), 786 So.2d 113. Irregularities or errors cannot be availed of on appeal if they are not objected to at the time of the occurrence. State v. Walker, 94-0587 (La. App. 1st Cir. 4/7/95), 654 So.2d 451, 453, writs denied, 95-1124 (La. 9/22/95), 660 So.2d 470 & 95-1125 (La. 9/22/95), 660 So.2d 470. Therefore, because the defendant did not object at the time of the alleged error, this particular assignment of error is not preserved for appellate review.
Moreover, we note that the scope of voir dire examination is within the sound discretion of the trial court; its rulings will not be disturbed on appeal in the absence of a clear abuse of discretion. Coleman, 188 So.3d at 205 ; State v. Williams, 560 So.2d 519, 523 (La. App. 1st Cir. 1990). Our review of the portion of the record cited by the defendant does not support his assertion that the State indicated that there was only one element to prove at trial. Further, as mentioned by the defendant on appeal, the empaneled jury was subsequently given full instructions on the State's burden of proof in this case. Considering the foregoing, we find no merit in the final pro se assignment of error.
CONVICTIONS AFFIRMED, SENTENCES VACATED, AND REMANDED FOR RESENTENCING.

On count one, the defendant was originally charged with human trafficking and the State later amended the charge as provided above. On counts two and three, consistent with La. R.S. 14:46.2(B)(2), the indictment includes the language "when the services include commercial sexual activities." As to count three, while the record shows that the victim was under the age of eighteen at the time of the offense, the State did not seek the harsher punishment pursuant to La. R.S. 14:46.2(B)(3). The statutory citations provided herein are consistent with the version of the applicable statute in effect at the time of the offenses.

We note that the verdict sheets do not include the language "when the services include commercial sexual activities" as stated in the grand jury indictment as to counts two and three. However, during the jury instructions prior to deliberations, the jury was specifically instructed that they had to find proof beyond a reasonable doubt that the services included commercial sexual activity on all three counts. See La. R.S. 14:46.3(A)(1) ; La. R.S. 14:46.2(B)(2).

Prior to this date, the FBI had information indicating that the defendant was involved in human trafficking. Specifically, the Shreveport Resident Agency of the New Orleans Division came into contact with the defendant during an operation. At that time, the defendant and other females were arrested, and DVDs containing footage of what was purported to be a reality television show on "pimping" and prostitution were collected.

The defendant was also in possession of marijuana at the time.

One of the documents contained written notes titled, "Pimping in Motion."

Herein, the victims will be identified by initials only in accordance with La. R.S. 46:1844(W)(1)(a), which allows the court to protect the identity of a crime victim who is a minor or a victim of a human trafficking-related offense by using his or her initials.

Out of the presence of the jury, K.W. initially confirmed that she was subpoenaed to testify at trial, but informed her counsel that she did not wish to do so. She further stated that she could not recall her pretrial statements, noting that she was sixteen years old at the time.

We note during the time period that the offense was alleged to have been committed, La. R.S. 14:46.3(A)(1) was amended by 2011 La. Acts No. 64, § 1, to add the phrase "maintain the use of' to the above list of words preceding the phrase "a person under the age of eighteen."

According to the human trafficking statute in effect at the time of the offense on count three, it is unlawful "[f]or any person to knowingly recruit, harbor, transport, provide, solicit, obtain, or maintain the use of another person through fraud, force, or coercion to provide services or labor." La. R.S. 14:46.2(A)(1) (as amended by 2011 La. Acts No. 64, § 1) (emphasis added).

In accordance with FBI policy, interviews of individuals who are not taken into custody are not recorded and the interviewer will instead take notes on their responses and complete an interview report. Agent Blacknell noted that another female, K.G., was the mother of at least two of the defendant's children. K.G. was known as the "bottom bitch," someone who has either made a lot of money for the pimp in the past or may be the mother of one or more children of the pimp, and is in charge of supervising the other females who work for the pimp. On the night of the operation, June 21, 2012, Room 240, the room that the defendant referenced as his room and where his items were recovered, was rented under K.G.'s name.

In State v. Templet, 2005-2623 (La. App. 1st Cir. 8/16/06), 943 So.2d 412, writ denied, 2006-2203 (La. 4/20/07), 954 So.2d 158, another panel of this court sua sponte amended a sentence to delete the illegal portion of the sentence and remanded solely for the correction of the minutes, despite this court's decision in State v. Paoli, 2001-1733 (La. App. 1st Cir. 4/11/02), 818 So.2d 795, 799-00, writ denied, 2002-2137 (La. 2/21/03), 837 So.2d 628, and the clear dictates of Haynes, 889 So.2d at 224. Given the Supreme Court's decision in Haynes, notions of judicial efficiency cannot override the judicial discretion reserved to the trial court.

Brady , 373 U.S. at 87, 83 S.Ct. at 1196-97.